BELLEW, et al. *v.* STATE.

No. 40863 November 3, 1958 106 So. 2d 146

736

*John M. Sekul, Clara Sekul Hornsby, Albert Sidney Johnston, Jr.,* Biloxi, for appellants.

*G. Garland Lyell, Jr.,* Asst. Atty. Gen., Jackson, for appellee.

740

KYLE, J.

The appellants, Preston Bellew and Tommy Bellew, were tried and convicted in the Circuit Court of Harrison County on an indictment which charged that Peggy Goudelock, Preston Bellew, Tommy Bellew, Douglas Thomas and Ruth Johnson, "did unlawfully, wilfully, feloniously and knowingly conceal and harbor one Dale Morris, an escaped prisoner, charged with the crime of murder, who had been confined as a prisoner awaiting trial for murder under the order of the Circuit Court of Hancock County, Mississippi." The two appellants filed motions for a new trial. The motions were overruled, and a judgment was entered sentencing each of them to imprisonment in the state penitentiary for a term of three years. From that judgment they prosecute this appeal.

The record shows that Dale Morris had been indicted by the grand jury in the Circuit Court of Hancock County, at the March 1956 term of the court, on a charge of murder in the killing of Charlie Flink. At the time of his escape he was confined in the Harrison County jail at Gulfport, under an order of the court, to await trial on the murder indictment. Morris escaped from the county jail sometime during the night of June 6, 1957, and remained at large several weeks before he was recaptured and returned to the Harrison County jail. Claude Miller, a deputy sheriff who lived at Long Beach, testified that when he left the jail to go to his home in the late afternoon of June 6, Morris was confined in his security cell on the east side of the third floor of the jail. Miller stated that he was notified of the escape about one o'clock that night; and that he went to the

jail immediately and found that a hole had been cut in the heavy mesh wire enclosure, referred to in the record as the sun cage, on the third floor of the building. The hole was 16 to 20 inches in width. There was one door leading out of the cage, and that door was locked when Miller arrived at the jail.

Dale Morris, Douglas Thomas, Peggy Goudelock and Ruth Johnson testified as witnesses for the State; and in view of the nature of the questions presented for our decision on this appeal, it is necessary that a brief summary be given of their testimony and the testimony of the appellants and other witnesses.

Dale Morris testified that he was confined in a cell on the third floor of the jail with several other prisoners, including Aden Bellew, a brother of the appellants, during the night of June 6, and that he got the wire cutters, which he used in effecting his escape, from Aden Bellew. Morris stated that he was up on the sun deck, and that he clipped the wire and got out of the cage and came down the wall. He then crossed over the street, and found an automobile waiting for him. The driver of the car was a colored man whose name he did not remember. They drove for about half an hour, and stopped in the woods close to Preston Bellew's mailbox, which was located several miles north of the City of Biloxi in the White Plains community. Morris got out of the car and whistled. Someone answered, and Preston Bellew and Douglas Thomas appeared on the scene with sacks of groceries and other things. The colored man drove off, and left Morris there with Bellew and Thomas. The two men carried the groceries to a place about 200 yards from the road, and told Morris to stay there that night and there would be somebody over in the morning with some water. Morris stayed there that night, and the next day Douglas Thomas brought him some water, and that evening Preston Bellew moved him over to a heavily wooded area where he set up camp. Morris remained there in the camp approximately one month. Morris

stated that Preston Bellew brought him a 22 Woodsman automatic pistol, and at a later date a 45 Colt automatic pistol. The two weapons were identified by Morris and offered in evidence, and Morris stated that they were the weapons which were in Peggy Goudelock's Pontiac automobile when he and Peggy separated in Wyoming sometime after he and Peggy left the State of Mississippi. Morris stated that Tommy Bellew came out to Preston Bellew's place twice while he was encamped in the woods, and Morris discussed with Preston and Tommy the best route to take in order to make his escape from Mississippi.

Morris stated that he had Ruth Johnson call Peggy Goudelock, who was in California at that time, and Peggy came and stayed out there with him four or five days, and then he and Peggy left and went west. Peggy arrived at Preston Bellew's house late at night, and Preston carried Peggy over to Morris' camp. The next morning Morris went with Preston over to Preston's house, and he and Preston pulled Peggy's car over behind some bushes and Morris covered it over in part with brush. Morris stated that, when he and Peggy were ready to leave, Preston Bellew and Ruth Johnson, at Tommy Bellew's suggestion, showed them the way out. "They drove through the back road to where we could find the highway." Morris and Peggy then crossed Highway 49 and went on to Poplarville. Peggy's car had a Mississippi license plate on it when Peggy got to the camp; and Preston Bellew and Ruth Johnson got some Louisiana license plates off of another car, and Morris put the Louisiana license plates on Peggy's car. Morris stated that it was more than a month after he escaped from the Harrison County jail before he left Mississippi.

On cross-examination Morris was asked whether he had given the district attorney a statement of the facts in the case. His answer was that he had related the facts as they happened. He did not know whether the facts had been set down in writing or not; but he had

not signed a statement of any kind. He admitted that he had entered a plea of guilty to a charge of manslaughter in the killing of Charlie Flink; but he specifically denied that he had made a deal with the district attorney, by the terms of which he would be permitted to plead guilty of manslaughter in the Flink murder case, and in return therefor he would give information about Preston Bellew and Tommy Bellew being involved in his staying out in the woods near Preston's house after his escape. Morris stated that he knew that the Negroes were waiting for him in the automobile when he escaped from the jail. The Negro man who was driving the car had been described to him by Aden Bellew, and the car had also been described to him. After they got out in the country Johnnie told him that Preston Bellew would be there at his mailbox to meet him. Morris stated that he had seen Douglas Thomas at the county jail, and he had seen and talked to Preston Bellew once or twice at the jail. He stated that Preston Bellew and Douglas Thomas both had sacks on their backs—sacks of groceries and bedding, when they appeared at the road side near Preston Bellew's mailbox the night that he escaped from the county jail. He stated that Preston Bellew came over to his camp almost very day while he was there; and Morris went to Preston Bellew's house one time. It was about one-fourth of a mile from the place where he got out of the automobile to Preston Bellew's house. Morris stated that Tommy Bellew did not come to see him at the camp until four or five days before he left there. He saw Tommy one other time at the house. Morris admitted that he had been convicted of desertion from the U. S. Marine Corps and had received a dishonorable discharge; that he had served a three-year term in prison for assault with intent to kill in Missouri; and that he had been sentenced to imprisonment for a term of 12 years for manslaughter as a result of the killing of Charlie Flink.

Douglas Thomas testified that he was living in the White Plains district in Aden Bellew's house, which was about one-half mile from Preston Bellew's house, at the time Morris escaped from the county jail; that Ruth Johnson, his sister, who was living in the Aden Bellew house at that time, had left word for him to help Preston that night; that he went over to Preston Bellew's house about 11 o'clock; and that he and Preston took some sacks out of a car that was parked in front of Preston's mailbox. Johnnie Brewer, a Negro man, was to bring Morris out there. Ruth had told Douglas what they were going to do, and Douglas and Ruth had gone over the route with Johnnie a day or two before, and had shown Johnnie where to go. Ruth had shown Johnnie where he was to park his car and pick up Dale Morris behind the "Daily Herald" office in Gulfport; and Douglas and Ruth had shown Johnnie how to drive out to Preston Bellew's mailbox. Douglas stated that Johnnie drove up to the mailbox about midnight and blinked the lights of his car and blew his horn, and Dale Morris jumped out. Preston and Douglas then took Morris into the woods across the road and left him there. Douglas went back the next morning at Preston Bellew's request and carried Morris some water, and Douglas went back the next night and carried Morris some food. He never went back to the camp again. Douglas stated that he had been indicted for his part in the affair and had entered a plea of guilty and agreed to testify for the State. He had never been convicted of any crime before that.

Peggy Goudelock testified that she had lived in Gulfport during the last several years, and that she became acquainted with Dale Morris when he was in the Harrison County jail. She learned of his whereabouts three or four weeks after his escape. She was in California at that time, and Ruth Johnson called her and told her where Morris was. She had been advised by the F.B.I. that the authorities were looking for Morris. Peggy

stated that she left California on Wednesday and arrived in Gulfport Friday afternoon. She got in touch with Ruth Johnson immediately. Ruth was staying at the big house on the Aden Bellew place in the White Plains community. Peggy and Ruth drove down the road a short distance to Preston Bellew's house, which was a smaller house, and Preston Bellew came out. Preston and Peggy then walked over into the woods where Morris was camping, and Peggy stayed there that night. Peggy testified that she saw Tommy the first time in the afternoon of the day following her arrival. She walked with Dale over to the well where Dale got water. Dale left her at the well, and walked toward the big house. He met Preston and Tommy Bellew about half way between the well and the big house, and the three men talked among themselves 30 or 40 minutes. There was another conference between Preston and Tommy Bellew and Morris the next afternoon, which lasted 30 to 40 minutes. Peggy stated that when she and Morris got ready to leave the camp three or four days after Peggy's arrival, there was some discussion among them and Tommy and Preston Bellew as to the best route for them to take to get to the highway and across the highway without going back through town. Peggy's car had been hidden back under some trees, and covered with limbs and branches so that it could not be seen from the air; and during the afternoon before she and Morris left, Preston Bellew and Morris helped her clean the car. Tommy Bellew was not there at that time. Peggy and Morris left the camp at night. Ruth Johnson and Preston Bellew drove ahead of them in Ruth's car to show them the way out to the highway. They went through the back way until they got to Highway 49. They crossed Highway 49 at Lyman and passed through Poplarville. Ruth Johnson and Preston Bellew had obtained a Louisiana license plate for Peggy's car, and the Louisiana license plate was put on Peggy's car before they left the state.

On cross-examination Peggy stated that when she and Morris left Mississippi they drove westwardly through Louisiana and Texas, and she and Morris were married on the trip. She was asked whether she had made a statement to the district attorney or the sheriff, or any other law enforcement officer, relating to her participation in Morris' escape and concealment. She stated that she had made and signed such a statement in the presence of Mr. Whittmann, the sheriff, and Mr. Hewes, the county attorney. Mr. Holleman was not present. She was asked whether she put anything in that statement with reference to Tommy Bellew. She stated that the statement showed that she saw Morris talking to the two men from a distance, that she had seen Tommy Bellew up there at the jail on visiting days; and that she recognized him and Preston Bellew when she saw Morris talking to them. Peggy stated that she did not see Tommy Bellew out near Morris' camp.

Ruth Johnson testified that the wire cutters which had been introduced in evidence were wire cutters which she had gotten from Tommy Bellew at his home in Biloxi and had carried to the jail in her purse. She had asked Tommy Bellew for them, and Tommy went across the street and got them out of an old truck. She told Tommy that Aden wanted them, meaning Aden Bellew who was in jail at the time. She stated that she knew Johnnie Brewer, the Negro that carried Morris away from the jail when he escaped, and that she showed Johnnie where to go and where to take Morris after his escape. She stated that Aden Bellew gave her a list of groceries and supplies and told her to take them to Preston Bellew's house, and that she got the groceries and supplies and took them to Preston Bellew's house, and put them in a Henry J. car sitting there in front of the house. She stated that she saw Morris with Preston Bellew behind the big house on Aden Bellew's place about two weeks after he broke jail. She stated that she saw Tommy Bellew at the Bellew place on two oc-

casions, once when he came there to help her move some clothes of Dale Morris that Peggy Goudelock had left with her when she left to go to California and had asked her to keep. She and Tommy took the clothes and put them in a Hudson car underneath some old clothes. Aden Bellew had told her to move the clothes; he didn't want to have himself connected with the matter. That was after Morris' escape. Ruth stated that she called Peggy Goudelock in California, and that after Peggy arrived in Gulfport she came out to White Plains where Ruth was living. Ruth was asked whether she had ever seen the two pistols which had been identified by other witnesses. She stated that she had seen one of them at Aden Bellew's house, and that Preston Bellew had taken the pistol and carried it to Morris. She knew nothing about the 45 automatic. Ruth stated that Tommy Bellew never carried any groceries out to the camp to her knowledge; and that she never heard any discussion with him while he was out there about Morris' escape. She was asked whether she remembered anything that was said about the escape and flight of Morris. Her answer was, "Yes, I do. Preston Bellew said to Dale Morris, 'I think you owe that much to Aden, to get rid of them for him.'" At this point the defendants' attorney objected to the question and the answer and made a motion for a mistrial. The court sustained the objection to the statement, "to get rid of them." The court overruled the motion for a mistrial. She stated that she heard the conversation between Preston and Tommy and Peggy and Dale Morris about how Morris was to leave. Preston and Tommy were telling Morris the best route to take to get out of there. Peggy's car was hidden close to Preston Bellew's house. Ruth was there the night Peggy and Morris left, and she and Preston Bellew showed them the way out. They drove over to Highway 49, and when they hit Highway 49 they told Peggy and Morris to go straight ahead.

Sheriff Joe Whittmann testified that Morris was arrested in Long Beach, California, sometime after his escape, and was brought back to Mississippi to await trial on the murder charge. The sheriff stated that, after Morris' return, he went with the sheriff and his deputies to the camp site in the White Plains community and showed the officers where the wire clippers, which he had used to effect his escape from the county jail, were hidden, and the officers found the clippers by the butt of a tree covered over with pine straw. The camp was in a wooded area about a half mile from Preston Bellew's house. The sheriff stated that he obtained possession of the 22 pistol, which Morris had with him when he left the state, from a gun shop in Idaho Falls, and that he got the 45 Colt pistol which Morris had with him from a U. S. Marshal in Idaho Falls.

Both of the appellants testified in their own behalf, and both denied specifically that they had anything to do with the harboring and concealment of Dale Morris after his escape from the county jail.

Tommy Bellew testified that he was living in Biloxi, and had lived there during the last five years. He owned his own home, and was engaged in the operation of a gasoline service station for the Gulf Coast Oil Company. He had been engaged in that business 7½ years. He had a wife and two children. He went to work at 4:00 o'clock in the morning and got off from work about 1:00 o'clock in the afternoon. Tommy stated that he had made two trips to the old home place, known as the Aden Bellew place, during the early summer. He made one trip up there to fix an electric wire for Ruth Johnson, so that she could see how to milk her cow. His wife and one of his children went with him on that trip. He made another trip up there with Grady Rushing to move Ruth Johnson when she wanted to leave the Aden Bellew place. Tommy stated that he had no information that Dale Morris was anywhere in that area at that time; and he specifically denied that he had gone up there

on one occasion to move some clothes that belonged to Dale Morris. He admitted that he had visited his brother Aden Bellew at the jail every Sunday; but he denied that he knew anything about Dale Morris, or that he had any dealings with Dale Morris after his escape from the county jail. He denied that Peggy Goudelock had seen him and Preston Bellew and Dale Morris talking behind Aden Bellew's house in the White Plains community; and he denied that he had ever seen the wire cutters which Ruth Johnson testified he had given her. He denied that he had anything to do with directing Dale Morris and Peggy Goudelock as to the route which they should take when they left the camp.

Preston Bellew testified that he lived about 12 miles north of Biloxi on Highway 57; that he had four children, all of whom were grown; that he had been working for the county as a member of the road crew of District No. 5 for more than a year; and that he was working for the county at the time it was said that Dale Morris escaped. He stated that he had never seen Dale Morris in the White Plains community. He denied that he had met Dale Morris with some sacks the night that he escaped from the county jail, or that he had carried him any food or water, or had done anything to help conceal him from the authorities. He denied that he had ever given Dale Morris a pistol of any kind. He denied that he had anything to do with changing the automobile license plates on Peggy Goudelock's car; and he denied that he and Tommy had given any directions to Peggy and Morris as to how to get out of the White Plains community, or how to get to the highway.

Mildred Bellew, Tommy Bellew's wife, testified that she made two trips with Tommy to the Bellew place in the White Plains community during the summer. One time Tommy went out there to fix an electric wire that had fallen down, and she went with him. The next time Tommy went out there to move Ruth Johnson to her sister's home. On that occasion Mildred went in Ruth

Johnson's car with Ruth, and Tommy and Grady Rushing came later with a truck. Lorenzo Krohn, the district manager of the Gulf Coast Oil Company, testified that Tommy had been working for the Gulf Coast Oil Company for about 7½ years, and that he did not remember Tommy ever missing work until he got put in jail as a result of the charges growing out of Dale Morris' escape. Tom Gartman, who was forman of the road crew of Supervisor's District No. 5, testified that Preston Bellew was working for him as a member of the road crew at the time Dale Morris escaped; and that Preston went to work at 7:00 o'clock in the morning and put in straight time during working hours. Gartman stated that he knew nothing about Bellew's activities after work hours. Mary Bellew, Preston Bellew's daughter-in-law, testified that she lived about a quarter of a mile from Preston Bellew's house on Highway 57; that she visited over at her father-in-law's place quite often during the summer; and that she never saw Peggy Goudelock over there, and she did not know that Morris was out there. David Brown, Preston Bellew's son-in-law, testified that he was living with Preston Bellew back in June, and there was no automobile placed on the property near Preston Bellew's residence at that time. If any such automobile had been there he could have seen it. Several witnesses also testified as character witnesses for Tommy and Preston.

The first point argued by the appellants' attorneys as ground for reversal of the judgment of the lower court is that Section 2142.5, Code of 1942, the statute under which the indictment was returned, is unconstitutional for the reason that it contains two subject matters and prescribes punishment for a misdemeanor and a felony in one statute. But we think there is no merit in that contention.

"Crimes are classified by some statutes according to the punishment actually imposed. Some courts have declared that where a crime may be punished as a misde-

meanor or as a felony, it will be considered to be a misdemeanor only. * * * In a majority of jurisdictions, however, when the court or the jury is given the discretion to fix the punishment for an offense by imprisonment in the penitentiary, fine, or by confinement in jail, such an offense is held to be a felony regardless of the penalty actually imposed.'' 14 Am. Jur. 763, Criminal Law, par. 13.

 This Court has adopted the majority rule that, when the court or the jury is given the discretion to fix the punishment for an offense by imprisonment in the penitentiary, or by fine or confinement in the county jail, such an offense is held to be a felony regardless of the penalty actually imposed. State v. Sansome, 133 Miss. 428, 97 So. 753; Ellis v. State, 203 Miss. 330, 33 So. 2d 837.

 It is next argued by the appellants' attorneys that the indictment returned against the appellants in this case is insufficient to charge an offense under Section 2142.5, Code of 1942, for the reason that the indictment fails to set forth the means by which the appellants concealed and harbored the escaped prisoner. But that contention was made and rejected by this Court in State v. Needham, 182 Miss. 663, 180 So. 786, in which the Court held that an indictment charging the defendant as an accessory after the fact was sufficient if it charged that the defendant wilfully aided and assisted a felon to escape after knowing that he had committed the felony, and that an allegation of specific acts which constituted the aiding and assisting was unnecessary. The rule announced in that case finds ample support in the authorities cited in the opinion rendered by the Court in that case. The rule itself and the reason therefor are stated in Bishop's New Criminal Procedure, Second Edition, Vol. 3, p. 1226, Sec. 8, par. 3, as follows: ''It is in no case necessary to use the word 'accessory' in the indictment, or to set forth the means by which the accessory before the fact incited the principal to commit

the felony, or the accessory after received, concealed, or comforted him; for it is perfectly immaterial in what way the purpose of the one was effected, or the harboring of the other secured; and as the means are frequently of a complicated nature, it would lead to great inconvience and perplexity if they were always to be described upon the record.''

It is next argued that the court erred in overruling a motion made by the appellants' attorney at the beginning of the trial that the district attorney be required to produce, and to make available for the inspection of the appellants' attorney, statements made by some of the State's witnesses to the district attorney or the county attorney relative to the appellants' actions in concealing and harboring Dale Morris during the four weeks period immediately following his escape from the Harrison County jail. The purpose of the motion was to require the production of statements previously given to the State's attorneys by Dale Morris, Douglas Thomas, Peggy Goudelock and Ruth Johnson, upon which the appellants' attorney assumed the indictment was based, and which might be useful to the appellants' attorney in cross-examining the witnesses.

We think there was no error in the action of the trial judge in refusing to order the district attorney to produce and make available for inspection by the appellants' attorney statements given by the State's witnesses to the prosecuting attorney before the trial. This Court has held in several cases that the defendant in a criminal case is not entitled to a bill of particulars. Westbrooks v. State, 76 Miss. 710, 25 So. 491; Quick v. State, 133 Miss. 634, 98 So. 108; Sanders v. State, 141 Miss. 289, 105 So. 523; McDaniel v. State, 191 Miss. 854, 4 So. 2d 355; and this Court said in McDaniel v. State, supra, ''* * * in the absence of a statute so requiring, the state is not bound to furnish to a defendant the names of the state's witnesses. 14 Am. Jur. pp. 913, 914, and the authorities there cited.''

■ ■ The general rule relating to the right of the accused to demand that he be permitted to inspect statements made by witnesses to the State's attorney before the trial in a case of this kind is stated in 23 C.J.S., 263, Criminal Law, par. 955, as follows:

"As a general rule, accused is not entitled to an inspection of the prosecution's evidence; the remedy is not available for exploratory purposes. It may not be had of private documents, or of documents or articles which are not evidence material to the crime or defense and which would not be admissible or would be admissible only by way of impeachment. Thus an inspection may not be had before trial of mere mnemonic instruments, whereby the prosecutor may refresh his recollection and that of the witnesses, or of statements by witnesses or codefendants or participants in the crime."

See also People v. Nields (1924), 70 Cal. App. 191, 232 P. 985; State v. Furthmeyer (1929), 128 Kan. 317, 277 P. 1019; State v. Richetti (1938), 342 Mo. 1015, 119 S.W. 2d 330; State v. Hall (1918), 55 Mont. 182, 175 P. 267; People ex rel. Lemon v. State of New York (1927), 245 N. Y. 24, 156 N.E. 84; Tinker v. State (1923), 95 Tex. Cr. 143, 253 S.W. 531; U. S. v. Simonds (1945), C.C.A. N.Y., 148 F. 2d 177; State v. Zimnaruk (1941), 128 Conn. 124, 20 A. 2d 613; People v. Moretti (1955), 6 Ill. 2d 494, 129 N.E. 2d 709; State v. Kelton (Mo. 1957), 299 S.W. 2d 493; State ex rel. Page v. Terte (1930), 25 S.W. 2d 459, 324 Mo. 925; State v. Pambianchi (1953), 139 Conn. 543, 95 A. 2d 695; People v. Marshall (1958), 5 App. Div. 2d 352, 172 N.Y.S. 2d 237; People v. Riser (1956), 47 Cal. 2d 566, 305 P. 2d 1, cert. den. 353 U.S. 930 (1957), 77 S. Ct. 721, 1 L. Ed. 2d 724. See also Note: Virginia Law Review, October 1958, Vol. 44, p. 997.

In the case of People ex rel. Lemon, Dist. Atty. v. Supreme Court of the State of New York (1927), 245 N.Y. 24, 156 N.E. 84, affirming 219 N.Y.S. 892, 219 App. Div. 725, the Court held that in a criminal prosecution,

documents and memoranda in the possession of the district attorney, not themselves admissible in evidence, were not subject to inspection by the defendant; hence enforcement of an order that such documents be filed in the office of the county clerk was properly restrained by an order of prohibition. In that case the Court in its opinion, written by Cardozo, C.J., said: "Documents are not subject to inspection for the mere reason that they will be useful in supplying a clew whereby evidence can be gathered. Documents to be subject to inspection must be evidence themselves. Falco v. New York, N.H. & H.R. Co., 161 App. Div. 735, 737, 146 N.Y.S. 1024; Woods v. Figaniere, 25 How. Prac. 522, 526, 527; Knight v. Marquess of Waterford, 2 Y. & C. Ex. 22, 36. No precedent can be found even in civil causes for compelling disclosure, in advance of the trial, of the office notes or memoranda prepared by an attorney after consultation with his witnesses, and summarizing his understanding of the testimony that is likely or expected."

In the case of People v. Moretti (1955), 6 Ill 2d 494, 129 N.E. 2d 709, the Court held that where, in a murder prosecution, the prosecution introduced into evidence, without objection, a transcript of the defendant's testimony before the grand jury and was permitted to read to the jury in the murder prosecution most of the transcript, except part where the defendant claimed he was on a narcotics investigation, and the defendant was given access to the same transcript, the court did not err in refusing the defendant's motion that the prosecution be required to produce a full complete record of the grand jury proceedings, as well as all extrajudicial statements made by any and all witnesses in the case. In the case of United States v. Simonds (1945), 148 F. 2d 177, the Court held that where the witness had not used a statement previously given to the district attorney to refresh the witness' recollection and there was no discrepancy between the witness' testimony and the state-

ment, the court's refusal to require delivery of the statement to counsel for the defendant who wanted it for use in cross-examination was not error. In the case of State v. Hall (1918), 55 Mont. 182, 175 P. 267, the Court held that under Rev. Codes, Sec. 7138, providing for the inspection of paper in the possession of the other litigant, and Sec. 9279, making civil rules of evidence applicable in criminal cases, the prosecutor need not allow the defendant to inspect an ex parte written statement of the circumstances of the crime by the prosecuting witness; such statement being inadmissible as substantive evidence.

In the case of State v. Kelton (Mo. 1957), 299 S.W. 2d 493, the Court held that in a homicide prosecution the trial court did not err in quashing on motion of the state the defendant's subpoena to compel the shorthand reporter to produce in evidence a sworn question and answer statement taken from the defendant by the prosecuting attorney on the day of the homicide. 42 V.A.M.S. Supreme Court Rules, rule 25.19. In the case of Tinker v. State (1923), 95 Tex. Cr. 143, 253 S.W. 531, the Court held that refusal of motion to compel state's attorney to furnish all written statements made by any witness in the case presents no error where such statements were not before the jury. In the case of State v. Zimnaruk (1941), 128 Conn. 124, 20 A. 2d 613, the Court held that in a prosecution for indecent assault where the shorthand notes and transcript of the complainant's statements made prior to the trial in response to questioning by the county detective were in court in the possession of the state, and there was no evidence that notes or transcript contained any statement contradictory to testimony given by the complainant as a witness for the state, the court did not err in refusing to require the production of such notes and transcript for any effect the possible presence therein of any contradictory statements might have upon the credibility of the complainant.

We have found no case in our own reports or any other state reports in which the Court has held that the trial judge committed reversible error in refusing to compel the prosecuting attorney to produce for inspection by the defendant's attorney before the State's witnesses had been called to testify statements previously given by the witnesses to the prosecuting attorney relative to the defendant's actions in the commission of the crime charged against him.

 █ In the case that we have here, Peggy Goudelock was questioned at length by the appellants' attorney on cross-examination about the statement which she had made in the presence of the sheriff and the county attorney; and there is nothing in the record to indicate that her statement to the officers before the trial differed in any respect from the statement which she made to the jury during the trial. The sheriff testified later for the State and was not questioned by the appellants' attorney about the statement which Peggy had made to him and the county attorney. Dale Morris stated on cross-examination that he had related to the district attorney the facts as they had happened, but he had signed no written statement. Douglas Thomas and Ruth Johnson were not questioned about statements which they had made to the prosecuting attorney before the trial. None of the statements made by the witnesses to the State's attorneys before the trial were offered in evidence or used by the witnesses to refresh their recollections; and we think there was no error in the court's refusal to enter an order requiring the district attorney to produce such statements, or his own notes or memoranda concerning the facts to be proved by each witness, and make the same available for the use of the appellants' attorney on his cross-examination of the witnesses, and if there was error, such error was harmless.

 █ It is next argued on behalf of the appellants that the trial court erred in admitting evidence relat-

ing to the commission of other crimes by the appellants' coindictees, and in admitting evidence relating to the appellants' brother Aden Bellew, who was then a prisoner in the Harrison County jail, and his actions in aiding and abetting Morris' escape from the county jail. But we think there is no merit in this contention. Evidence which is material, relevant, and otherwise competent to prove the guilt of the accused in a case of this kind cannot be excluded because it may result in the disclosure of facts relating to the commission of other crimes. And this is especially true when the fact of the commission of such other crime forms a part of a chain of facts so intimately connected that the whole must be heard in order to interpret its several parts. Raines v. State, 81 Miss. 489, 33 So. 19; Collier v. State, 106 Miss. 613, 64 So. 373; Hurd v. State, 137 Miss. 178, 102 So. 293; Stone v. State, 210 Miss. 218, 49 So. 2d 263; Tanner v. State, 216 Miss. 150, 61 So. 2d 781.

 It was necessary in this case that the State prove that Dale Morris was in lawful custody at the time of his escape, that he escaped from such lawful custody, and that the appellants had knowingly concealed or harbored him after his escape; and evidence to establish all of those facts was competent. The fact that three of the State's witnesses had been indicted jointly with the appellants and had pleaded guilty to the charge, and the facts relating to their joint participation with the appellants in the concealment and harboring of Dale Morris after his escape, were facts relevant to the issue which the jury had to decide; and testimony to establish those facts was properly admitted, even though that testimony showed that Dale Morris was held as a prisoner on a charge of murder and that some one or more of the appellants' co-indictees had aided in his escape, and even though that testimony showed that the appellants' brother, Aden Bellew, who was confined in jail with Morris awaiting trial on another charge, had aided in the escape.

The appellants' attorneys also argue that the court erred in overruling the appellants' motion for a mistrial on account of the statement made by the county attorney in his argument to the jury which appears on page 415 of the record. The statement made by the county attorney to which objection was made, and the ruling of the trial judge in response to the objection, are as follows:

"By MR. HEWES: When you deliberate on the case I want you to do what your moral senses tell you is right, and I believe that when you do that you will find these two defendants guilty as charged, and you will show to the people of Harrison County that a person who has killed another is not going to be allowed to be harbored and concealed by a citizen of this county and given a gun where he can go out there and kill some more.

By MR. SEKUL: I object to that form of argument, and move for a mistrial, May it please the Court. There is nothing concerning a killing in this case, and it is highly prejudicial.

BY MR. HEWES: Dale Morris killed a man, and they gave him a gun. That's the testimony.

BY MR. SEKUL: Put that in the record, Mrs. Tootle, and I further move for a mistrial on that ground.

BY THE COURT: Of course at the time of the alleged incident Dale Morris only stood charged with murder. So I think it would have been better had the County Attorney said they had concealed a man who was charged with murder, rather than a man who killed some one. I will sustain the objection to that extent. I will overrule the motion for a mistrial."

 ██ We think that the action of the Court in sustaining the objection to the county attorney's argument to the extent mentioned above was proper; and there was no error in the court's refusal to sustain the motion for

a mistrial on account of the remarks made by the county attorney.

It is next argued that the court erred in refusing to grant three instructions requested by the defendants, which appear on pages 23, 24, and 25 of the record. But there was no error in the court's refusal to grant those instructions. The first instruction was designed to advise the jury as to the weight to be given to the testimony of a defendant who testifies as a witness in his behalf, and is an almost exact copy of the instruction which this Court refused to approve in Conn v. State, 205 Miss. 165, 38 So. 2d 697. The second instruction purports to define reasonable doubt, but the language used is so ambiguous and uncertain in its meaning that the jury would have been confused, rather than aided, by the giving of the instruction. The subject matter of the third instruction was amply covered by another instruction given by the court which appears on page 17 of the record.

 ██ Finally it is argued that the trial court erred in overruling the appellants' motion for a new trial on the ground that the verdict of the jury was contrary to the weight of the evidence. On that question there is a difference of opinion among the members of the Court. All of the judges agree that the evidence was sufficient to sustain the verdict of the jury as to the appellant, Preston Bellew, and that there was no error in the action of the trial court in overruling the motion for a new trial as to him. A majority of the judges, namely, Judges Hall, Lee, Holmes, Ethridge and Gillespie, are of the opinion that the evidence was sufficient to sustain the verdict as to the appellant, Tommy Bellew, and that there was no error in the court's action in overruling the motion for a new trial as to him. But four of the judges, namely, Chief Justice McGehee and Judges Roberds, Kyle and Arrington are of the opinion that the verdict as to Tommy Bellew is contrary to the weight of the evidence and that the court should have sustained

the motion for a new trial as to him. The four dissenting judges do not think that this is a case for a directed verdict of not guilty as to Tommy. But the four dissenting judges are of the opinion that the evidence relating to Tommy's participation in the concealment and harboring of Dale Morris is so slight that it cannot be said that his guilt was proved beyond a reasonable doubt. The four dissenting judges are of the opinion that the jurors, having under consideration at the same time the overwhelming proof of Preston's guilt, failed to evaluate properly the evidence upon which the State relied to convict Tommy, and that another jury should be permitted to pass upon the question of Tommy's guilt separate and apart from the guilt of Preston.

A majority of the judges, however, are of the opinion that the evidence in the record is sufficient to support the verdict of the jury as to Tommy, as well as Preston, and the judgment of the lower court is therefore affirmed as to both appellants.

Affirmed.