267 So.2d 480

**Herbert Max VEITH, alias**

**v.**

**STATE.**

**6 Div. 173.**

Court of Criminal Appeals of Alabama.

Sept. 12, 1972.

Rehearing Denied Oct. 10, 1972.

Richard A. Thompson, Tuscaloosa, for appellant.

William J. Baxley, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State.

TYSON, Judge.

The indictment charged the appellant with first degree murder of one Clarence E. Thomas. The jury's verdict and judgment set punishment at ten years and one day imprisonment in the penitentiary.

The State presented the testimony of Larry Thomas, who testified that he lived with his father, Clarence E. Thomas, at the Wagon Wheel cafe and gas station on the Montgomery Highway in Tuscaloosa County, Alabama. He testified that on Monday evening, March 17, 1970, his father had fixed supper for him in the back room of the cafe, and that soon thereafter Donna Veith, the wife of the appellant, came by the cafe with her sister. Each of the women had a young child with her, and they stayed an hour or so drinking beer. Shortly after 8:00 in the evening, the sister and her two-year old child left, leaving his father and Donna Veith drinking beer at the Wagon Wheel, accompanied by her three-year old son. A party by the name of Larry had come by and taken his father over to Bill Hargrove's place to get some more beer, and they came back shortly before 9:00 p. m. His father then counted

his money, closed the gas pumps, and shortly thereafter told young Larry Thomas that he was leaving to drive to town to take the other people home. This was shortly before 10:00 in the evening. At about 2:00 a. m., on Tuesday morning, his father returned with Donna Veith and her three-year old son. Larry Thomas stated he remained awake about thirty minutes and that his father and Donna Veith were in the back part of the store at this time. He stated that in the back of the bedroom in the rear of the building, there were two beds. He stated that a little after 2:30 a. m. his father laid down on the bed with him and that Donna Veith and her child laid down on the other bed and went to sleep; that he later heard the little Veith boy crying and that he waked up and saw Donna Veith trying to comfort the child; that his father was still lying on the bed with him. He stated that he was suddenly awakened about 5:00 in the morning by the sound of a shot; that he shook his father, who was lying on the bed with him, and his father got up and started walking toward the door where Donna Veith was struggling with her husband, who had a shotgun in his hand; that the appellant pushed Donna Veith over on the bed and fired a second shot, and that his father fell over and slumped on the floor; that he heard the appellant say something about "Get away from my wife"; that Mr. Veith told him to go call for an ambulance.

The State presented the testimony of Rufus Strickland, Coroner of Tuscaloosa County, who testified that he investigated an incident at the Wagon Wheel cafe or service station on March 18, 1970; that in the rear bedroom of the building he found the body of the deceased, one Clarence E. Thomas, lying on the floor on his knees, face down, in a crouched position. The deceased had on a white tee shirt, underwear, shoes and socks. His pants were zipped up. The body contained a gunshot wound under the right arm in the armpit area being one and a half inches in diameter which had gone through the lung, out the bottom of the heart causing massive hemorrhaging on the body and on the floor. The cause of death was attributed to the gunshot wound in the chest. Mr. Strickland further testified that he saw no indication of sexual intercourse on the clothing or on the person of the deceased.

John Cork testified that he was a police officer of the Tuscaloosa Police Department, and on the early morning of March 18, 1970, he received a call to go to investigate a shooting down at the Wagon Wheel cafe on U. S. Highway 82 toward Montgomery. He stated that he arrived at the scene with Detective Harless. He testified that he went into the back room of the building, which was the living quarters, and saw the body of one Clarence E. Thomas slumped over with his head between the knees, face down, in a pool of blood. He stated that he found two empty twelve-guage shotgun hulls about two inches apart lying in front of the counter, and that there was a twelve-gauge pump shotgun lying directly across the room on top of the counter. He stated that he observed a hole in a deep freeze and the wall in a corner of the room about two feet above the floor, the hole being about two inches in diameter. He stated that about this time Officer Thrasher came in the room, picked up the shotgun, ejected a shell from the chamber and gave the live shell to him. He stated that he took possession of the shotgun, the live shell, and the two empty shells, and that they had been in his exclusive custody and control since that morning. The shells and shotgun were then offered in evidence, and the shells were shown to be No. 6 shot. Officer Cork testified that the hole in the deep freeze and wall contained shot from a shotgun shell. Mr. Cork further stated that the only people at the cafe when he arrived were Donna Veith, her three-year old son, and the appellant; that he had arrived there shortly after 6:00 in the morning. He testified that three other officers also came up to help assist at the investigation, Sgt. Kerney and Officers Clark and Thrasher.

Police Officer Marshall Thrasher of the Tuscaloosa Police Department testified that on March 18, 1970, he went to the Wagon Wheel cafe on the Montgomery Highway about 6:00 in the morning in response to a police radio dispatch. He stated that the dispatch did not include any information as to what had happened at the Wagon Wheel. Following the laying of a "pre-Miranda Predicate," the officer stated that he walked up with fellow Officer Clark and asked, "Who got shot?" He stated that both Mr. and Mrs. Veith were standing outside the building near a car; that Mr. Veith stated, motioning inside the building, "I caught him shacking up with my wife, and I shot him." Officer Thrasher stated that at this point his only information had been from the police radio that a shooting had taken place at the Wagon Wheel, and that he had no information as to who had been involved or what the circumstances were. He stated that he went inside the building after Detective Cork arrived and saw the deceased lying on the floor with his head between his knees in a pool of blood, and that he picked up the shotgun from the counter in the presence of Detective Cork and ejected one shell from it; that there were two empty shells lying on the floor in the room and he saw Detective Cork pick up these; that Detective Cork had arrived some ten minutes after he did. He stated that neither he nor any of the other officers attempted to question either the appellant or Mrs. Veith at the scene; that one of the officers took Mrs. Veith and the child back to the trailer where they lived, approximately one quarter of a mile from the Wagon Wheel, and that Mrs. Veith was fully dressed. Officer Clark corroborated the other officers' testimony.

The appellant had entered pleas of not guilty and not guilty by reason of insanity. In support of these pleas, appellant testified as to having come to this country from Germany soon after World War II, and had lived and worked with his aunt and uncle in New York City for twenty-two months before returning to Germany. After a visit there to his parents, he returned to the United States again upon finding out of the availability of a job in Jacksonville, Florida. It was while living and working there that he met his wife and married. There were four children born of this union. He gave a lengthy discussion of his twelve years of marriage, including several incidents involving marital difficulties wherein he caught his wife with other men. He contended that his wife drank beer excessively, and that in recent years this had become more prevalent. Appellant testified that on the day of the shooting he had had lunch with his wife and that it was her birthday; that he had planned to come home that evening and cook steaks for the whole family; that when he came home she was not there, and after a time he began to look for her. He stated that he went over to the Wagon Wheel and could see her sitting inside with her sister drinking beer. He further testified that he watched them from the outside of the building for an hour or more, and upon seeing them leave he borrowed an automobile and went riding through the Tuscaloosa area looking for his wife and Clarence E. Thomas. Upon not finding them, he finally returned to the area of his trailer home, which was located approximately one quarter of a mile from the Wagon Wheel cafe on the Montgomery Highway. He stated that he saw his wife's car outside the cafe and, after returning the car he borrowed, he went back to the cafe and remained outside the building for a couple of hours, as he had looked inside and seen that the parties were asleep. The appellant stated that he heard Clarence Thomas wake up and go over to the bed where his wife was and state, "You promised me, come on honey," and that his wife refused, saying, "No, I won't." He stated that at this time he wanted to protect his wife and that he ran to the trailer where they lived and seized his twelve-gauge shotgun and ran back to the Wagon Wheel cafe.

The appellant's version of what occurred is as follows:

"Q You had the gun in your hand as you ran from the trailer?

"A I am glad you mentioned that. You asked me what I was thinking when I got the gun and so many things went through my head, I was scared, I was afraid. My wife was—I remember when I was running with the gun that I wanted to kill myself in front of my wife. Something like this went through my mind and all those things went through my mind in just a flash. I can't explain them. Like I said, when I got to the door my wife was standing out there and I pushed against it or inside of it. The door was halfway open and I don't know if I fired the shot or the gun went off but it was the first shot fired and I said something about, I hollered out something I remember, 'You leave my wife alone,' or, 'Don't you bother my wife any more,' something like this, and after that first shot my wife came from the side; she was right next to me. She grabbed me around the back and struggled the gun away and when I shoved away like this the gun went off and when that happened I was standing right at the counter and when I jerked around the gun went off and I laid the gun down and I seen something like a shadow going down at the end of the counter. I walked to the end of the counter and seen this man down on his knees and by that time a little boy came out from the back room, out from the back, and I told him, 'Boy,' I said, 'Please call the police and the ambulance,' and he just stood there a minute and I said, 'please run to the phone and call the ambulance and the police,' so the boy left and I walked back to the door again and by that time my wife had got the little boy, which I didn't see up until now, got my little boy and was sitting out in the chair, in this chair out beside the place, and I was just halfway laying down; I didn't know what happened. I didn't know how bad the man was hurt.

I couldn't understand what happened and I stood there waiting for the police to come. Right away one policeman said, 'What is going on?'

"Q Before the police came was anything said to you about fleeing, leaving the area?

"A My wife wanted me to come home. She said, 'Let's go home, honey,' and I remember she grabbed me by the arm and that she said—I said, 'No, we can't,' and she said, 'That little boy don't know you,' and I said, 'No, we can't leave; the police will have me in three minutes,' something like this, and she sat down and we waited.

"Q How long did you wait?

"A Not long.

"Q Fifteen minutes?

"A No, sir, about ten minutes.

"Q You waited during this ten minutes for the police to come?

"A Yes, sir, and the police came up and said what was going on, real harsh like, and I said, 'I think I shot this man.' I didn't mean, you know, that I killed the man or anything. I didn't want to explain to him. I told him, 'I think I shot this man,' and another policeman came told me—One policeman searched me and told me to go sit in the back of the car and while I was sitting in the back of the car I seen the policemen going in and out from the door and going over to my wife and saying something and then the ambulance came up and I seen the men going in with the stretcher and I was sitting there waiting for that man to come out and they never did come out and after a while the policeman came drove me to the police station."

The appellant presented the testimony of a number of character witnesses in his behalf, all of whom had known him when he lived in York, Alabama, or when he lived in Tuscaloosa, Alabama, and worked

with Drake Printers. Each testified that his general reputation in the community was very good and that his reputation for peace and quiet was very good.

Appellant presented the testimony of Dr. Lewis C. Sharman, a practicing psychiatrist in Tuscaloosa, who testified that he had consulted the appellant as his patient and that the appellant was the type person who was abnormally passive by nature and when hurt he would take out his feelings by being a more productive worker. He stated that appellant was, in his opinion, mentally and emotionally disturbed; that he did not believe he could form an intent to kill; that he was caught up in such mental emotion that he had an irresistible impulse to protect his wife; and that this motivation was what caused him to act as he did on the day of the shooting.

Following the appellant's evidence, the appellant's wife, Donna Veith, was called as a rebuttal witness by the State. After first being advised that she could not be compelled to testify and as to her full rights as a wife, she insisted on testifying. Likewise, one of the appellant's children, his daughter, Anneliese Veith, also testified as a rebuttal witness. This testimony was largely contradictory of the appellant's own testimony pertaining to their marital relationship and difficulties and need not be here set out. The appellant also presented rebuttal testimony.

## I

Prior to trial the appellant had filed a pretrial motion with the Court, asking that the Court allow his attorney an opportunity to interview young Larry Thomas, the son of the deceased. This matter was presented and heard prior to trial and the Court's ruling is as follows:

"THE COURT: I have interviewed John Thomas and his nephew, Larry Thomas. It is the understanding of the Court Larry Thomas is a witness to the occurrence. According to Mr. John Thomas, young Larry Thomas gets emotionally upset whenever this case is mentioned. I am of the opinion the Court should do nothing by way of insisting that young Larry Thomas be interviewed by attorneys representing Defendant. If young Larry Thomas takes the stand, of course he would be permitted to be cross examined or subject to direct examination as a witness."

■ At trial Larry Thomas was called by the State to testify and did in fact break down on the witness stand during the direct examination which required a recess, and the trial court then allowed the State to present other witnesses' testimony. The boy's testimony was resumed the following day. At this time the appellant had full opportunity to cross-examine Larry Thomas. At no time, either prior to trial or during trial, did the State use a pretrial statement in its presentation of Larry Thomas' testimony. Appellant's counsel contends that the trial court erred in not requiring the State prosecutor to deliver a taped interview with Larry Thomas to him for his use in the preparation of his defense under Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103.

This Court is of the opinion that the trial court did not err in refusing to require the district attorney to deliver the taped interview with young Larry Thomas to the appellant just prior to trial. Mabry v. State, 40 Ala.App. 129, 110 So.2d 250, cert. dismissed 268 Ala. 660, 110 So.2d 260; Sanders v. State, 278 Ala. 453, 179 So.2d 35; Smith v. State, 282 Ala. 268, 210 So.2d 826.

■ Likewise, the State had not attempted to use any pretrial information obtained from Larry Thomas in presenting his testimony, nor did the State's attorneys prevent appellant's counsel from interviewing Larry Thomas through his own efforts prior to trial. It was because of the prior emotional condition whenever the subject of the shooting was brought up which made his guardians, his grandmother and his uncle, advise the appellant's attorney and

the trial court that they did not believe it best for the child to be subjected to a pre-trial interrogation.

Thus, the trial court was correct in its ruling in this respect due to the child's tender years and the emotional stress about which the boy's grandmother and his uncle had previously advised the court. We believe the trial court correctly therefore did not require young Larry Thomas to be subjected to an interview just prior to the inception of trial. Ex parte Denton, 266 Ala. 279, 96 So.2d 296. See also Smith v. State, 45 Ala.App. 63, 223 So.2d 605; Gallman v. State, 29 Ala.App. 264, 195 So. 768; Baker v. State (Fla.), 47 So.2d 728; United States v. Dryden (5 Cir.), 423 F.2d 1175; Byrnes v. United States (9 Cir.), 327 F.2d 825; Walker v. Superior Court, 155 Cal. App.2d 134, 317 P.2d 130.

■ It is axiomatic that the order of the presentation of testimony is within the sound discretion of the trial court, and when Larry Thomas broke down on the witness stand, it was entirely proper for the trial court to call a recess and then ask the State to present other witnesses' testimony and to allow the boy's testimony to be resumed the following day. At this time, full and extensive cross-examination of Larry Thomas was allowed by the trial court. This consumed almost half a day. We believe the trial court's action in this respect to be correct. Jackson v. State, 239 Ala. 38, 193 So. 417; Drum v. Ezekiel and Harrison, 83 Ala. 384, 3 So. 715.

## II

■ Appellant filed a motion for continuance requesting that more time be allowed Dr. Sharman for psychiatric examination. Dr. Sharman testified that he had had full opportunity to evaluate the appellant's condition. The matter of continuance is addressed to the trial court's sound discretion, and we do not believe that an abuse of the same has been here shown. Peaden v. State, 275 Ala. 72, 152 So.2d 136.

## III

■ Appellant argues that two peremptory challenges were granted the State, and such is alleged to be error.

We have carefully examined the record wherein this allegedly occurred (R. p. 95), and find that no ruling of the trial court was invoked in relation to the State's challenges. In this state of the record, nothing is here presented for our review.

## IV

■■ Appellant also contends that the trial court's overruling of his attempt to exercise a common law challenge for cause of a prospective juror who on examination stated that he felt pleas of not guilty and not guilty by reason of insanity were inconsistent, was error. Where, as here, the appellant attempts to assert a common law ground as a basis for his challenge, there must be some matter which imports absolute bias or favor and leaves nothing for the discretion of the court, or a situation which presents a mixed question of law and fact to be determined by the trial court in its sound discretion. We are unwilling to say in the case at bar that the trial court was in error in not allowing the challenge for cause. Mullis v. State, 258 Ala. 309, 62 So.2d 451.

## V

■ Appellant challenges the admission of the statement which he made to police officers Thrasher and Clark upon their arrival at the Wagon Wheel cafe shortly after 6:00 in the morning on the basis of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974. The trial court correctly allowed the appellant's counsel to take the two officers on voir dire outside the presence of the trial jury, Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908.

■ Further it was established that neither officer was aware of the names of

the persons involved in the alleged shooting, nor any details pertaining thereto at the time of their arrival at the cafe. Both testified that they were answering a radio dispatch to investigate an alleged shooting which had been reported by telephone. The applicable rule was stated by the Alabama Supreme Court in Truex v. State, 282 Ala. 191, 210 So.2d 424, regarding "custodial interrogation" as follows:

"' * * * We mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' "

It is clear that neither of the officers upon arrival at the scene were attempting to interrogate the appellant nor had he been taken into custody. To the contrary, he exclaimed to the arriving officers in response to "Who got shot," "I caught him shacking up with my wife and I shot him."

We conclude that the trial court correctly admitted this statement in evidence, having determined its voluntariness as being a spontaneous exclamation. Bedingfield v. State, 47 Ala.App. 677, 260 So.2d 408, and cases cited therein.

## VI

■ The appellant claims error by the trial court in permitting counsel for the State to examine the appellant with respect to prior difficulties had previously with named persons. From appellant's brief:

"The record reveals that the Defendant and witnesses were continuously asked about the Defendant having been charged with assault and battery, adultery, alien property, asked about his F.B.I. record, whipping his child, beating his wife, and all such things as these. . . ."

In each of the instances above complained of, we have carefully examined the record and find that there was no objection or exception by the appellant to any of these questions. In the state of the record as thus presented, no question is therefore presented for review. Lovelady v. State, 15 Ala. App. 615, 74 So. 734; Coleman v. State, 22 Ala.App. 296, 115 So. 72; Harrison v. Baker, 260 Ala. 488, 71 So.2d 284; Guy v. State, 48 Ala.App. 293, 264 So.2d 214. .

## VII

■ Counsel argues on behalf of the appellant that the State was erroneously allowed to ask questions of several character witnesses pertaining to specific past acts of misconduct on the part of the appellant. While it is true that the form of the question should be "Have you heard," rather than "Do you know," Jarrell v. State, 251 Ala. 50, 36 So.2d 336, we have carefully examined the record in each instance complained of and find that all of such questions were answered in the negative by the witnesses. Such error, if any, was rendered harmless by the negative answers. Dixon v. State, 38 Ala.App. 395, 85 So.2d 156, and cases cited.

## VIII

■ Appellant further claims error in not being allowed to use a statement given by Donna Veith to the district attorney's office prior to trial for purposes of cross-examining her. Jencks v. United States 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103. Here, the prosecution did not call Donna Veith in its case in chief but rather presented her testimony in rebuttal. This was a fact of which appellant and his counsel were made aware the day prior to her testifying. She stated that she was doing so because of what she had read in the newspapers quoting her husband's testimony pertaining to her actions and activities. The State did not use the statement which it had in its file in its examination of Mrs. Veith, nor is there any claim of surprise by the appellant. Further, the State gave the statement to appellant's counsel and offered it in evidence, prior to the cross-examination, whereupon the appellant's counsel objected.

We do not therefore believe that appellant's constitutional rights were here vio-

lated. Mabry v. State, 40 Ala.App. 129, 110 So.2d 250; Sanders v. State, 278 Ala. 453, 179 So.2d 35; Smith v. State, 282 Ala. 268, 210 So.2d 826; Bellew v. State, 238 Miss. 734, 106 So.2d 146; Parker v. State, 266 Ala. 63, 94 So.2d 209.

## IX

■ In the closing argument the following occurred:

"MR. BURROUGHS: Is this what they taught him in Nazi Germany when he was real little, when there is something they don't like is that the way they taught him to solve the problem?

"MR. THOMPSON: I object to that.

"THE COURT: Sustain the objection."

There was evidence given as to appellant's membership in the German Youth Corps, during his boyhood while in Germany, under the Nazi Regime. However, here, the appellant did nothing further than to object, and such objection was sustained, and appellant did not move to exclude such argument, or move for a mistrial, or invoke a further ruling by the trial court, therefore no question is here presented for review. Lambert v. State, 208 Ala. 42, 93 So. 708; Elliott v. State, 19 Ala.App. 263, 97 So. 115; Boyett v. State, 18 Ala.App. 363, 92 So. 515.

## X

■ Appellant calls attention to several charges requested in writing and refused by the trial court. We have carefully examined each of these charges, as is our duty, and we find that each was either improper statements of the applicable law, abstract, or was fairly and substantially covered elsewhere in the oral charge of the trial court, or other given charges of like effect and varying phraseology, hence their refusals were harmless. Brooks v. State, 248 Ala. 628, 29 So.2d 4; Coats v. State, 253 Ala. 290, 45 So.2d 35; Lambert v. State, 208 Ala. 42, 93 So. 708. Title 7, Section 273, Code of Alabama, Recompiled 1958.

## XI

■ Finally, appellant urges error in the overruling of his motion for new trial which was based on certain alleged newly discovered evidence. The most serious question presented in this motion was the alleged refusal of the trial court to call appellant's daughter, Anneliese Veith, to testify on hearing the motion. The daughter, eleven years of age, was, in the words of Mrs. Cozart, representing the Department of Pensions and Security, "very emotionally upset, did not wish to testify further," and distraught. Moreover, the trial court ruled "in the absence of any showing that this child is going to disavow any previous testimony given at trial," he would not require her to appear.

The general rule governing newly discovered evidence is to the effect that such must be shown to be unknown to appellant and could not have been discovered before trial in the exercise of due diligence. Further, that such evidence must be such as not merely cumulative or for impeachment merely, but rather must be of such nature as to be sufficient to probably change the result of the trial. Lackey v. State, 41 Ala.App. 46, 123 So.2d 186; Washington v. State, 259 Ala. 104, 65 So.2d 704; Hodge v. State, 32 Ala.App. 283, 26 So.2d 274.

We are of the opinion that there has been no showing of an abuse of the trial court's discretion in its ruling on the motion for new trial. Cases cited, supra.

We have carefully examined the record, consisting of Four Volumes, containing some 700 pages, and find same to be free from error; Title 15, Section 389, Code of Alabama, Recompiled 1958. The judgment of conviction is due to be and is hereby

Affirmed.

All the Judges concur.

## ON REHEARING

Appellant's counsel calls our attention to several instances involving rulings by the trial court, record, pages 475–482, wherein Donna Veith, as a rebuttal witness for the State, was allowed to give testimony contrary to testimony given by the appellant and cites same to be error. From appellant's brief:

"On Page 475 of the Record, when Donna Veith was first being examined, we objected and took exception in the Court letting into evidence that Donna Veith had gotten a warrant for her husband on assault and battery and nonsupport; we objected again on Page 477 of the transcript when Donna Veith testified that her husband had left her in Jacksonville. We objected to the hearsay testimony twice on Page 479 and 480 of the Record (reference apartment where appellant lived after leaving Donna Veith and children); we objected further on Page 482 as to the hearsay of what the brother had said; there are many more incidents in the Record typical to these pages where prejudicial testimony was introduced by the State and defendant objected and was overruled and we excepted."

We cannot agree that the rulings referred to are error. It is within the trial court's discretion to receive, in rebuttal, testimony which more properly should have been offered as part of the case in chief. Blackwell v. State, 264 Ala. 553, 88 So.2d 347, and cases cited.

Such matters having been gone into in the appellant's testimony were proper matters for rebuttal testimony by the State through Donna Veith; and we cannot say that such rulings constituted an abuse of discretion on the part of the trial court in the instances cited. Burns v. State, 246 Ala. 135, 19 So.2d 450; Scott v. State, 246 Ala. 545, 21 So.2d 703; Blackwell v. State, supra, and cases cited.

Opinion extended, application overruled.

All the Judges concur.