301 So.2d 272

Charles William **CANNON**

v.

**STATE.**

**6 Div. 565.**

Court of Criminal Appeals of Alabama.

Aug. 13, 1974.

Rehearing Denied Oct. 1, 1974.

Robert R. Bryan, Birmingham, for appellant.

William J. Baxley, Atty. Gen., Montgomery, and David L. Weathers, Asst. Atty. Gen., Birmingham, for the State.

TYSON, Judge.

The appellant, Charles William Cannon, was indicted by the Grand Jury of Jefferson County for the first degree murder

of Jack Warren, Jr., by shooting him with a pistol. The Jury found the appellant guilty of murder in the second degree and fixed punishment at twenty-three years imprisonment. The trial court entered judgment in accordance with this verdict and subsequently denied appellant's motion for new trial following a hearing.

On May 31, 1972, at approximately 8:00 p. m., two black males arrived at the Chrystal Service Station, located at 2131 Twenty-Sixth Street North in the City of Birmingham. According to State's witness Samuel Wheeler, age sixteen, who was employed there, the men were riding in a beige 1963 Dodge automobile. Wheeler serviced this automobile, the driver, Josh Stephens, gave him $2.00 for the gasoline, and he went inside the station to obtain the change due him. While Wheeler was getting the change, the passenger, whom Wheeler identified as the appellant, Charles William "Slim" Cannon, came into the station and engaged the deceased, Jack Warren, Jr., in conversation. Wheeler stated that the appellant first walked out of the station's office and then went back in. As he did so, the deceased, Jack Warren, Jr., put a pistol, which he kept in the station, in his pocket. Wheeler stated that the deceased told the appellant to move his vehicle so that he could service other cars. Words were exchanged and the appellant started walking toward the deceased. From the record [pp. 77–79]:

"Q. All right. When Slim started walking towards Jack, what did Jack do?

"A. Jack was coming out of his pocket.

"Q. What did Slim do?

"A. Slim kept going towards him.

"Q. All right. Then what happened?

"A. Then Jack came out of his pocket with the gun.

"Q. What happened then?

"A. Slim grabbed him around the wrist and beat his arm against the cash register.

"Q. Which hand did Jack have the gun in?

"A. In his right hand.

"Q. All right. And when he came out of his pocket with the gun, did he have it pointed towards Slim, or towards the floor.

"A. Pointed towards the floor.

"Q. Tell me what happened then.

"A. Then Slim kept knocking his hand up against the cash register and knocked the gun down between the cash register and the adding machine.

"Q. In here (indicating)?

"A. Yes, sir.

"Q. Then what happened?

"A. Then Slim hit Jack in the chest with his fist and picked up the gun and shot him.

"Q. All right. Which did he do first and with which hand? Tell us.

"A. He hit Jack with his right hand.

"Q. Which hand did he pick up the gun with?

"A. Left.

"Q. What did he do then?

"A. Put it in his right hand and shot Jack.

"Q. When he shot Jack where was Jack standing?

"A. Standing in front of the restroom.

"Q. Was the restroom door closed?

"A. Yes, sir, it was closed.

"Q. All right. Now, when Slim shot, was Jack's hands down, or were they up in any way?

"A. I really didn't see. I was still on the floor.

"Q. Did you ever see Jack Warren advance towards Slim?

"A. No, sir.

"Q. Did you ever see anything in Jack Warren's hands after the gun fell on the table?

"A. No, sir.

"Q. What happened then?

"A. A few minutes later, after the shot, I ran out the door.

"Q. Well, now, before you ran out the door, what happened, if anything? Did Slim stay there, or did he leave?

"A. He must have left.

"Q. When you got up from the—behind the desk, did you see him?

"A. No, sir.

"Q. What did you do then?

"A. I ran out the door."

Wheeler then stated that he went to his home and telephoned the police, who came to the station within a few minutes to investigate. Wheeler, on cross-examination, further testified that he was taken to the police station on four separate occasions and was shown photographs of a number of persons before he finally identified the appellant. He stated that he had originally told the police and news reporters on the night of the homicide that he could not identify the assailant. He further testified that it was on the fourth occasion that he made a positive identification of the appellant from photographs shown to him at police headquarters, and he also identified the driver of the vehicle as Josh Stephens from photographs shown to him.

Terry Lynn Ferguson, a ten year old girl, testifying for the defense, stated that she was in the station at the time of the homicide, but that the appellant was not present. She stated she had gone there to purchase some candy. However, on cross-examination, she testified that she, while at police headquarters with her brother, had previously identified the appellant to the police as the person who allegedly shot Warren. This identification, however, was recanted by her at trial. She stated that she was frightened and that was why she identified the appellant.

The appellant presented a number of alibi witnesses who testified that he was at the home of Mrs. Annie Martha Miller, 2825 Twenty-First Alley North, on the night of the homicide, playing cards. Mrs. Miller, her husband, a sister, a daughter, and a niece, and in addition two other males, testified that the appellant had been present since late afternoon at her home, on May 31, 1972, where all of them were playing a game of "Whisk." They stated that the only time the appellant left was shortly before 7:00 p. m. to go to the liquor store to purchase some gin and wine, accompanied by one David Boykin. They stated he was gone between thirty and forty-five minutes, and that he returned and continued playing cards with them. These witnesses further testified that around 8:00 p. m., one Eddy Williams came to the home and told them about a man being shot at the Chrystal Service Station; that a group of them walked with the appellant to the vicinity of the station to find out what had happened.

The appellant also presented the testimony of several persons who claimed to be at or near the Chrystal Service Station shortly before 8:00 on the evening in question, and whose testimony was to the effect that they did not see the appellant at or near the premises in question.

The State presented a rebuttal witness, Mrs. Eleanor Ann Adaway, who testified that she was with her husband on the evening of May 31, 1972, having come to the Carraway Methodist Hospital to see her grandmother. She stated that they were returning to their home shortly before 8:00 p. m. when they ran out of gasoline in the North Birmingham area. She stated they had just turned on Twenty-Sixth Street, about a block and a half from the Chrystal Service Station. She testified that she and her husband walked to the service station where Samuel Wheeler filled an antifreeze can with gasoline for them. While she was in the station she saw the appel-

lant sitting in a parked automobile at the pumps. She stated that she and her husband walked back to the car, put in the gasoline, and then returned to the station to deliver the can. She stated that when they returned a number of persons had gathered, and that her husband told her not to get out of the car as someone had been hurt in the station. She stated that she did not hear any shots. She stated that some two days later she saw the driver of the automobile near Kent, and that she telephoned the police. She further testified that she had been unable to positively identify the appellant, but did identify the driver, Josh Stephens, by photographs shown to her by the police about two weeks after the incident. Mrs. Adaway stated that the appellant had stared at her for about ninety seconds while she was in the station, and that she was able to get a good look at his face.

Mrs. Adaway, on cross-examination, testified that the police had asked her to come to the courthouse while the case was in trial. From the record [pp. 846–848]:

"Q. Did you ever hear a shot?

"A. No, sir.

"Q. When did you tell the police that this man, here (indicating), Charles Cannon, was the person that you saw in the car?

"A. Just as soon as I saw him yesterday.

"Q. Where were you yesterday?

"A. Back in an office most of the time, sitting back there.

"Q. Where were you when they showed him to you, or pointed him out to you?

"A. They did not show him—they didn't even—they came there and asked me—Do you want me to tell you what they came and asked me?

"Q. I am asking you where you were.

"A. They did not point him out at all.

"Q. Where were you?

"A. I was in the office on the—going up the hall, on the left. Him and Detective Gullion, or Sergeant Gullion, came in there and said: 'Mrs. Adaway, would you and your husband go out the door, turn to the right, walk down the end of the hall, turn to the right, look at the people in the hall, go to the courtroom door and look through the courtroom door and see if you see anybody you recognize.'

"Q. Where did you see Charles Cannon? Where was he when you saw him?

"A. He was sitting on the bench.

"Q. Who was next to him? What did the people look like around him?

"A. There was two colored girls sitting next to him. One had on great, big bell bottoms that were real bright.

"Q. All right.

"A. The other one, I'm sorry, I don't recall. When I seen him, it shook me up.

"Q. Well, the police talked to you after this happened, didn't they?

"A. We went back up there, and they asked did either one of us see anyone that we recognized. And I said, 'Yes,' and they said, 'Where was he sitting?' And I said, 'He is sitting on the bench, the third one down.'

"Q. Did anyone walk down the hallway with you?

"A. No, sir.

"Q. You were by yourself?

"A. Me and my husband.

"Q. Did you talk with the police after that night, after it happened?

"A. Oh, yes, sir. They came and took a statement that night—no, not the night it happened, but the night afterwards.

"Q. All right. When did you talk with them after that? When was the next time?

"A. I saw the one that came to the door down at Kent's, in North Birmingham, about—Well, this was on Wednesday, and we were down there on Friday. I called them that night and told them I had seen the one—one of the ones that were at the service station."

In rebuttal by the defense, the alleged driver, Josh Stephens, testified that he had gone to Durham, North Carolina, to seek employment during the latter part of May, 1972, and on May 29 or 30, he had talked with a man named Foushee pertaining to employment at a laundry and dry cleaning.

The appellant also presented the testimony of Mr. Foushee, who stated that he interviewed Josh Stephens on the morning of May 30, 1972, at the office of his laundry in Durham, and that Stephens reported for work the following Monday, June 5 as a driver.

## I

■ Appellant contends that the testimony of Police Sergeant Gullion, pertaining to a conversation between the prosecuting witness Wheeler and Gullion, was inadmissible as such was "hearsay" designed to corroborate Wheeler's testimony.

An examination of the transcript reveals that during cross-examination of Wheeler by appellant's counsel the number of instances in which Wheeler appeared at police headquarters was inquired into, as well as circumstances under which his ultimate identification of the appellant took place. Defense counsel had interrogated Gullion as to whether or not the conversations were transcribed; as to inquiries upon Wheeler by the officers, and, finally, had the officers not threatened to put Wheeler in jail if he did not identify the appellant. Since these circumstances had been thoroughly gone over by defense counsel in cross-examination of Wheeler, it was proper for the State of Alabama to bring out the remainder of the conversation, Burgess v. State, 256 Ala. 5, 53 So.2d 568, even though the parts of the initial conversation might not have been admissible in the State's case in chief. Gibson v. State, 91 Ala. 64, 9 So. 171; Brown v. State, 37 Ala.App. 595, 74 So.2d 521, cert. denied 261 Ala. 696, 74 So.2d 524.

## II

■■ Appellant next contends that the prosecution conducted a post indictment lineup when the rebuttal witness, Mrs. Eleanor Ann Adaway, identified the appellant as a passenger in the vehicle which she saw at the Chrystal Service Station on the night in question.

Appellant cites us to United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L. Ed.2d 1149; Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178. The pertinent facts surrounding this issue are:

1. R. p. 843: Mrs. Adaway identified accused as the man in the car at the station.

2. R. p. 847: Mrs. Adaway states that Sergeant Gullion told her "to walk down the hallway of the court, look at the people there and look in the courtroom door and see if you see anybody you recognize."

3. R. p. 847: Accused was sitting on a bench in the hall with two young colored girls.

4. R. p. 860: Mrs. Adaway says there were some white men out in the hall "but there was some more colored people out there."

5. R. p. 861: There was one black man who was dressed real nice—just like defense counsel.

6. R. p. 864: Mrs. Adaway says that there were eight or ten black men in the courtroom when she made the identification of the accused in the hallway.

7. R. pp. 843–852: Mrs. Adaway stated that on the night of the shooting she got a close look at the man in the car and looked at him for about ninety seconds.

From the above, it is clear that the witness, Mrs. Adaway, had an independent origin for the identification made by her of the appellant. Also, the procedure here used was not a "lineup" in the proper sense. Trial had already commenced, and the defense was presenting its case when Mrs. Adaway walked down the hallway in the courthouse and observed the appellant. There was no suggestion by any of the officers as to the appellant, or any other party. It is clear that she was able to recognize the appellant from observing him on the night in question at the service station, and that there was no prior substantial discrepancy in this identification process. She had stated to the officers that if she saw the appellant again she would be able to recognize him.

We are of the opinion that the trial court properly admitted this in-court identification. Harvard v. State, 50 Ala.App. 147, 277 So.2d 421; Hall v. State, 50 Ala. App. 666, 282 So.2d 104; Haggler v. State, 49 Ala.App. 259, 270 So.2d 690.

### III

■ Appellant contends that he was prevented from cross-examining Mrs. Adaway in his attempts to impeach her credibility in several instances. We have carefully examined the record and find that, not only did the trial court permit an extensive and exhaustive cross-examination of Mrs. Adaway, as was appellant's right under Title 7, Section 443, Code of Alabama 1940, but, further, defense counsel was permitted to place in evidence such facts as an emotional breakdown in 1967, hospital medical records of Mrs. Adaway from both the University Hospital and Carraway Methodist Hospital, a divorce from, and remarriage to, her husband, and also the death of her mother. We are clear to the conclusion that such examination may well have gone beyond the permissible grounds for questioning a witness pertaining to a mental condition, or mental treatment, at a time prior to trial, as indicated by the opinion of the Supreme Court of Alabama in Garrett v. State, 268 Ala. 299, 105 So.2d 541. This opinion clearly indicates that questions which indicate a condition at a time prior to trial, or not contemporaneous with a matter being inquired about, are not admissible for impeachment purposes. *Garrett*, supra.

This court is aware, and we are confident the able trial judge was aware, of the opinion of the United States Fifth Circuit in Powell v. Wiman, 287 F.2d 275, pertaining to the suppression of evidence by the prosecution which bears on the mental competence of a state's witness. However, in *Powell,* the witness was an alleged accomplice about whom the State had certain information in its files. No such set of facts exists here.

■ The appellant calls attention to the trial court's ruling in its questioning of Mrs. Adaway pertaining to her alleged drinking, citing Campbell v. State, 23 Ala. 44. From the record [p. 926]:

"Q. In that period, in May, 1972, you were still drinking a lot then, weren't you?

"MR. WAITES: We object.

"A. No, I was not.

"THE COURT: I am going to sustain the objection to going into whether she was—if she was, on this occasion, you can ask her whether or not she was drinking. But whether or not she was drinking generally would not have any bearing on the issues involved here.

"Q. And you weren't suffering from any mental problems at that time, were you?

"A. No, I felt like everything was going to be fine at that time.

"MR. BRYAN: That's all."

We have examined this aspect of the cross-examination and we agree with the statement of Mr. Justice Harwood in Cooper v. Magic City Trucking Service, 288 Ala. 585, 264 So.2d 146, pertaining to the entire cross-examination of Mrs. Adaway, when the Supreme Court held:

"Where, as here, there was not a scintilla of proof that the witness Pope was drinking at the time of the occurrence, it would appear that the question sought to elicit testimony approaching the utmost outer limits of permissible cross examination. The question would result in a proliferation of evidence of seemingly little probative value, and no error should be cast upon the trial court, even had the objection to the question been timely made."

It therefore follows that the trial court's rulings were proper.

## IV

Appellant contends that certain notes made by the witness Foushee when interviewing the alleged driver of the vehicle, Josh Stephens, pertaining to a job in Durham should have been admitted in evidence as "business entries."

It is clear from the record, however, that the appellant did not lay a proper predicate to show that such notes were made in the regular course of business, as required by Title 7, Section 415, Code of Alabama 1940.

Moreover, the testimony of the witness, himself, was the best evidence of the time of this alleged interview. We see no injury to the appellant. Rule 45, Revised Rules of Practice, Supreme Court of Alabama, Title 7, Appendix.

## V

Appellant contends that the refusal to give certain written requested charges was error, and that the trial court erred in stating the law in certain portions of its oral charge.

In reply to this latter assertion of error, the appellant stated at the conclusion of the trial court's oral charge [R. p. 976], "The defense is satisfied, your Honor."

In the absence of the required exception, nothing is presented here for review. Massey v. State, 49 Ala.App. 345, 272 So. 2d 271, cert. denied 289 Ala. 747, 272 So.2d 278; Carmichael v. State, 52 Ala.App. 25, 288 So.2d 807.

The trial court here gave six of the written requested charges in addition to its oral charge.

We have examined the refused charges and determined that refused charges Nos. 1, 3, 6, 20, and 21 were affirmative in nature, and therefore properly refused under the evidence in this cause. Title 7, Section 273, Code of Alabama 1940; Bailey v. State, 23 Ala.App. 369, 125 So. 693.

Refused charges Nos. 5, 10, 11, 12, 13, 14, 16, 17, 18, 24, 25, 29, 38, 39, and 40 were fully and adequately covered by the trial court's oral charge and other given charges; hence their refusals were proper. Title 7, Section 273, Code of Alabama 1940; Caraway v. State, 18 Ala.App. 547, 93 So. 376.

## VI

Finally, in appellant's motion for new trial, he brings forth the testimony of Mrs. Grace Mae Sherrod, who testified that she saw a beige Dodge at the service station about 7:30 on the evening in question and stated that the passenger therein was one Robert Daniel, a black man with whom she was acquainted. She further stated that she was not present at the time of the homicide as she purchased some gasoline, then left to go to a local hospital.

It is clear from reading Mrs. Sherrod's testimony that such was not known to the members of the district attorney's staff,

**518**

but that Mrs. Sherrod had simply been interrogated by one detective, whom she could not remember, within a few days of the homicide.

It is clear from examining this testimony that such was cumulative in nature, and, as such, was a proper basis for denying appellant's motion for new trial. Veith v. State, 48 Ala.App. 688, 267 So.2d 480, and authorities therein cited.

Moreover, we doubt that such would have changed the result of trial. *Veith,* supra, and cases therein cited.

We are also clear to the conclusion that this matter was not shown to have been in the possession of the district attorney, and, in fact, Mrs. Sherrod testified that it was the appellant's counsel who came to interview her following trial.

We do not equate these circumstances with those shown to exist in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.

It therefore follows that there has been no substantiation whatsoever of the suggestion that there was here the knowing suppression of evidence favorable to the accused within the meaning of *Brady,* supra, and related cases. United States v. Harris, 5 Cir., 458 F.2d 670; Thigpen v. State, 49 Ala.App. 233, 270 So.2d 666; Veith v. State, 48 Ala.App. 688, 267 So.2d 480; and authorities therein cited.

As required by Title 15, Section 389, Code of Alabama 1940, we have carefully examined this entire record, the trial being in five volumes, comprising some 985 pages, with a sixth volume consisting of 73 pages, containing the evidence on motion for new trial, and find same to be free from error. It therefore follows that the judgment of the trial court is due to be and the same is hereby

Affirmed.

ALMON, HARRIS and DeCARLO, JJ., concur.