304 So.2d 914

**Bobby Wayne SMITH**

v.

**STATE.**

**7 Div. 319.**

Court of Criminal Appeals of Alabama.

Dec. 17, 1974.

H. Merrill Vardaman, Anniston, for appellant.

William J. Baxley, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was indicted for murder in the first degree and convicted of manslaughter in the first degree with his punishment fixed at ten years imprisonment in the penitentiary. He was represented at arraignment and trial by a court-appointed lawyer. He pleaded not guilty. He was furnished a free transcript and new counsel was appointed to represent him on appeal.

This unfortunate homicide occurred on Thanksgiving Day, November 22, 1973, in the street in front of the home of Mr. and Mrs. Charles Messer at 301 Chestnut Street, Anniston, Alabama.

Appellant and the deceased, Markquette Champion, were formerly husband and wife but had been divorced ten years before the date she was shot and killed. After her divorce from appellant, she married Jerry Patrick Champion, and they had a three-year old son at the time of her untimely death. Markquette and her second husband had been separated one month before her death.

The day before Thanksgiving Day, appellant came to the Messer home where the deceased and her son were staying. He brought his two sons with him. They all decided to have Thanksgiving dinner together. Appellant and Markquette went to the market to buy the turkey and all the other things that usually go with a Thanksgiving dinner. Appellant paid the bill. He also bought a six pack of beer. The turkey was cooked the night before. Appellant and his two sons spent the night at the Messer home. They slept on a pallet on the livingroom floor. Markquette and her son also spent the night there. They had a bedroom to themselves. The Messer's and their children had their own sleeping quarters.

The next morning, appellant helped prepare the Thanksgiving feast and they all ate dinner around 1:00 P.M. The adults drank beer before dinner. After dinner appellant left the Messer house.

Appellant had been having a love affair with a woman who will be referred to as "Sandra" in this opinion. Appellant and Sandra came to the Messer home around 3:00 P.M. on Thanksgiving day. Prior to the arrival of Sandra, appellant and the deceased had been most friendly and had been joking with each other, but the atmo-

sphere and moods of the parties changed noticeably. There was an undercurrent of resentment between appellant's paramour and his ex-wife. Appellant brought a six pack of beer, and they all drank the beer. They agreed to go to a drive-in theatre to see an x-rated movie. The plan was to go in Sandra's car. Sandra and appellant left saying they would return at five o'clock. After they left, the deceased and Mrs. Messer decided they were not going with appellant and Sandra and would go to another drive-in and carry the three-year old son of the deceased.

Deceased, Mrs. Messer and the little boy returned home around 11:00 P.M. and found Sandra and appellant parked in front of the Messer home. The deceased pulled up and stopped behind Sandra's car. Sandra got out of her car and walked to the driver's side of the deceased's car and asked why they did not wait on them to go to the movie, and where they had been. She was told that they decided to go to another drive-in to see "Walking Tall." Appellant got out of Sandra's car and walked back to the deceased's car and he appeared to be mad. Mrs. Messer had gotten out of the car at this time and was standing close to Sandra. She heard appellant say something to the deceased but she could not understand the words. The deceased made some slurring remarks about appellant and Sandra and told the appellant to take Sandra and leave and not to come around her any more. Appellant pulled a pistol out of his pocket and pointed it in the face of the deceased and told her he was going to kill her. She told appellant that she was not sixteen years of age any more and was not afraid of his gun. She told appellant to put his gun up and he put it in the right hand pocket of his pants. The three-year old boy was asleep on the back seat of the car, and the deceased asked appellant to pick him up and carry him in the house, and he refused her request. She asked him several more times to carry the child in the house, and he continued to refuse.

The deceased got out of her car and leaned back on the front seat to get her car keys and pocketbook, and while she was leaning over, appellant shot her one time in her left hip. Because of her position, the bullet ranged upward and went through her lung and came to rest inside the sac of her heart.

After she was shot she fell back on the ground with her head on the grass. She asked appellant why he shot her and he told her he loved her and didn't mean to shoot her. Mrs. Messer asked her if she was shot and she said yes, and she picked her head up off the grass and appellant got a paper towel and wiped her face and told her not to die. He told her if she wouldn't die he would never hurt her again. The deceased said to appellant, "Bobby Wayne, take me to the hospital, you have hurt me bad." Appellant told Mrs. Messer to call an ambulance and she told him she did not have a telephone, and she was not going to leave Markquette. Mrs. Messer asked Sandra to go for help and she got in her car and left. Appellant still had the pistol in his hand and he looked at Mrs. Messer and said, "This is an accident", and put his pistol in her pocketbook. When Sandra got back Mrs. Messer told her to take the pistol out of her pocketbook. Sandra took the pistol and put it under her shirt.

The police officers and the ambulance arrived about the same time. Sandra went to one officer and told him she had something to tell him and he told her to wait until the victim was put in the ambulance. The officer then went to Sandra and she took the pistol from her shirt and handed it to him and pointed to the appellant.

Appellant rode in the ambulance to the hospital, and while Markquette was in the emergency room he was arrested and carried to Police Headquarters. He was given the *Miranda* rights and warnings and made and signed a statement. This statement was never offered in evidence, and appellant did not testify in his behalf.

A State Toxicologist performed an autopsy and testified:

"The wound was located on the left rear back, six inches to the left of the midline, and on a level with the navel on the front of the body, six inches left of the midline above the left buttock."

\*     \*     \*     \*     \*     \*

"The bullet entered on the left rear back, as stated, and penetrated the left kidney—the bullet entered and went through the left kidney, and comparing the body being in a vertical position, it continued upward slightly toward the front, through the curvature of the stomach here (indicating), and the diaphragm here (indicating), and went into the heart and damaged the heart. There is a covering around the heart called the pericardial sac, the little sac that the heart rests in. The bullet was found loose inside that sac. There was damage to the left pulmonary vein and artery. I removed the spent bullet."

Mrs. Messer testified that she rode with appellant the day before Thanksgiving to a place where he bought the pistol that he used to shoot the deceased. He did not tell her why he was buying the pistol. The pistol surrendered to the officer by Sandra was identified as a .25 caliber semi-automatic pistol.

The spent bullet recovered from the body of the deceased together with the pistol were sent to fire arms expert for examination and comparison. He test fired the weapon and made a microscopic comparison and testified:

"It is my opinion that the evidence bullet, as identified to me as recovered from the body and delivered to me was fired from the weapon submitted, the .25 caliber semi-automatic pistol."

There was testimony that this was a foreign made pistol with a side safety. Even when the safety is off, there is a grip safety on the back of the handle which means the weapon cannot be discharged unless it is gripped and pressed in.

Sandra was the only witness to testify in behalf of appellant. She said she had been going with appellant for over a year and that she was in love with him. She admitted on cross-examination that she had been having sexual relations with him, but they had never discussed marriage. She said she knew that appellant had been married to Markquette, but had been divorced from her about ten years. She had known Markquette for two years and had double-dated with her on occasions.

Her testimony as to the events leading up to the shooting was not remarkably different from the testimony of Mrs. Messer. It was her judgment that the shooting was accidental as she heard appellant tell Markquette after the shooting that he loved her and didn't mean to shoot her.

At the conclusion of the state's case appellant, out of the presence of the jury, moved to exclude the state's evidence on the following grounds:

"Mr. Love: The defense moves to exclude the state's evidence and assigns the following grounds: They have not made out a prima facie case; have not proved the corpus delicti; have not produced any evidence to show that the defendant killed Markquette Champion with malice, premeditation, and deliberation as required by the indictment of first degree murder. They have, by their own case, shown that it was an accident."

"The Court: I am entirely satisfied from my interpretation of the events that this is purely within the province of the jury; if a man says 'I am going to shoot you' and a woman says, 'I am not sixteen years old, put that thing away' and he shoots, it is up to the jury to decide the meaning of that."

In addition to the motion to exclude appellant requested the affirmative charge in writing which the court marked refused.

The court charged the jury on all four degrees of homicide.

■ In a prosecution for murder, it is for the jury to determine the claim of the accused that the shooting was accidental. Harrell v. State, 160 Ala. 91, 49 So. 805; Powell v. State, 219 Ala. 557, 123 So. 34; Macon v. State, 36 Ala.App. 651, 63 So.2d 32; McMillan v. State, 44 Ala.App. 216, 205 So.2d 603.

■ The evidence is uncontradicted that appellant pointed the pistol in the face of the deceased and told her he was going to shoot her, and she told him to put the pistol up. He put the pistol in his pocket but when she turned her back to him to get her car keys and pocketbook, he shot her in the back. It is true that appellant told Mrs. Messer that the shooting was an accident, but it is also true that the pistol had a side safety and if the side safety had not been moved the pistol could not have been fired. And, too, with the side safety off the weapon still would not fire until the handle was gripped. Therefore, appellant had to make two conscious and deliberate acts in order to shoot the deceased.

In Garrett v. State, 268 Ala. 299, 105 So.2d 541, our Supreme Court said:

"* * * An unintentional killing of a human being arising from a wanton or reckless use of firearms, in absence of intent to discharge the weapon under circumstances not evidencing a heart devoid of a sense of social duty, is manslaughter and may be classified as voluntary or involuntary, as the circumstances of the case dictate. (Citing authorities)."

We have carefully searched the record for error injuriously affecting the substantial rights of appellant and have found none.

The judgment of the court below is

Affirmed.

All the Judges concur.