326 So.2d 150

**Jerry Reynolds STUCKEY**

v.

**STATE.**

**3 Div. 393.**

Court of Criminal Appeals of Alabama.

Jan. 20, 1976.

Warren S. Reese, Jr., and L. H. Walden, Montgomery, for appellant.

William J. Baxley, Atty. Gen., and James S. Ward, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was convicted of murder in the second degree and, in accordance with the verdict of the jury, he was sentenced to twenty years in the penitentiary. He was represented at arraignment and trial by retained counsel who represents him on appeal. He pleaded not guilty.

The evidence in this case is in sharp conflict. The state's evidence made a strong case of murder without any extenuating circumstances. The evidence for appellant tended to show the shooting was accidental.

Appellant and the deceased were husband and wife and had been married four years at the time of the shooting around midnight on March 2, 1974. They had a three-year-old daughter as a result of their marriage. They lived in a trailer in the Ramer Community of Montgomery County, Alabama.

Byron Harris whose nickname was "Buddy" was one of the state's key witnesses. He testified that he knew both appellant and the deceased but was not related to either of them. He stated he had occasion to be with both of them the night before the shooting at a local lounge in Montgomery. All three had something to drink and this witness danced with the deceased and so did appellant. They became friendly during the evening and Buddy was invited by appellant and the deceased to spend the night with them at their trailer and he accepted their invitation. He followed them to Ramer in his pickup truck and slept on the couch in their trailer home. He left the next morning about ten o'clock. Before leaving, appellant and the deceased invited him to a party that night at another trailer located two down from appellant's. He stated that he did not know anyone at this party except appellant and the deceased and that he danced some with the deceased.

Harris further testified that after a while he noticed that appellant was watching them and he mentioned this to the deceased and asked her if he was jealous. She replied that her husband was only jealous of John. The last name was not mentioned. He quit dancing with the deceased as he appeared to be getting upset. Soon thereafter a telephone call was received advising that a couple who had attended the party had become involved in a wreck. Appellant and the deceased started leaving without telling him good-bye, and they were having a discussion but Harris could not hear what was being discussed.

Harris further stated that he approached appellant and the deceased outside by their car and asked appellant what was the matter and he *bluntly* said nothing. Harris then asked the deceased what was wrong and he did not get a reply. The deceased got in the car with her husband and Harris walked up to the car and asked her again what was the trouble, and she said, "Nothing, we will be back in a minute." Harris said he thought they were going to the wreck, but they pulled into their driveway. Harris then started back to the party and he heard a loud noise. About that time he heard someone yell that appellant just called and said he had shot Kaye accidentally.

Harris further stated he jumped in his truck and pulled into appellant's driveway and ran in the trailer house.

We quote from the record:

"A. Well, I opened the door and I didn't see nothing, and I turned to go— when I turned to go down the hall, you could see Kaye's head laying in the floor down the hall. I went on back there and I turned into the bedroom. I had never been in the bedroom, but I went straight back that way because it was the only place to go. When I got there, Kaye was laying on the floor face up with her head at the end of the bed where you could see it almost from the hallway. Jerry was standing at her feet and he had the phone. He had both hands hanging down to his side and he had the phone in one hand and he had the gun in the other hand.

"Q. Now, which hand did he have the gun in?

"A. He had the gun in his left hand and he had the phone in his right hand, and he was just standing there staring. I looked down at Kaye first and when I looked back at him, I said Jerry what in the hell did you do. He stood there a minute and then he said I was putting the gun in the closet. So I looked at the closet and the closet door was open, and then about that time some more people started coming into the trailer."

According to this witness, appellant did not say to him that he accidentally shot his wife but only said he was putting the gun in the closet. He said appellant was covered with blood from his shoulder all the way down; that there was blood over the wall behind the telephone; that there was blood on the bed, and there was blood in the corridor between the bed and telephone stand where deceased was lying.

This witness further stated that several people came in the trailer three or four minutes after he arrived. He noticed Kaye move her head and mouth and he said she is not dead, "let's get her up and get her to the hospital," but this was not done immediately, because someone said the Sheriff had been called and they said,

"Let's wait until the Sheriff gets here before we move her." He said it was eventually decided that Kaye should be carried to the hospital. He stated that he got her arms and some others got her head and they put her in the back seat of the car and carried her to the hospital.

This witness stated that appellant did not help put his wife in the car. That he came out of the trailer with the gun in his hand after she was in the car. He said appellant drove the car to Montgomery and there were two other men in the car with him. After arriving at the hospital and after Kaye Stuckey was pronounced dead, Harris drove the two men from the hospital back to the trailer where the party was.

Harris further testified that appellant and his attorney called on him at work prior to the preliminary hearing and one of them asked whether he was sure that he saw the gun in the defendant's hand. The witness told them he was sure he saw the gun in his hand which prompted the defendant to say that he did not have the gun in his hand. The witness explained that he again told the defendant that is what he saw; that when he walked into the bedroom, the defendant had a gun in his hand. The defendant then told the witness to think, deep down inside his heart before he said he saw the defendant with a gun in his hand to which the witness replied, "I am sorry, but I saw it and that was the way it was."

Mr. Richard A. Roper testified that he was employed by the State Department of Toxicology and Criminal Investigation and was stationed in Montgomery. After stating his education, background and experience, he was asked if he had occasion to examine a .38 Smith and Wesson pistol, serial number 432720, and he said yes. He described the pistol as a .38 caliber special revolver, model 10, with a four-inch barrel, and that it was a standard double action revolver. He further testified that the pistol was turned over to him by Deputy John Moorer of the Montgomery Sheriff's De-

partment on March 4, 1974. This witness was asked the condition of the pistol when he received it and stated:

"A. When I first examined the weapon, there was blood on the left side of the frame of the weapon and the left side of the cylinder. There was a large blood clot which drained from the barrel of the weapon while I was conducting my initial preliminary examination. This was a semi-fluid blood clot. The weapon itself was, as far as its general condition is concerned, was very difficult to turn just in a rotating fashion. It was very difficult to rotate this way. It was with some difficulty also that I was able to make the cylinder swing out from the frame. As part of my study of the weapon, I test fired the weapon and collected known bullets fired through the barrel of the weapon. During this portion of the examination I found the weapon to be extremely difficult to fire.

\* \* \* \* \* \*

"A. The revolver was turned over to me March 4, 1974, by Deputy Moorer. I looked at the weapon several times subsequent to that date. I examined it on March 4 when Deputy Moorer brought it into the laboratory. It was at this time that I observed the blood on the weapon, the blood in the barrel of the weapon and that certain functional aspects of the weapon were very difficult. I went in on several occasions after that, went into the examination of the weapon in question. After this time, several times subsequent to the month of March I examined the weapon, probably three or four different times.

\* \* \* \* \* \*

"A. I found no blood in the mechanism of the weapon. In my opinion the blood was not the cause of the misfunction.

\* \* \* \* \* \*

"A. In test firing the weapon, my usual routine when I test fire a gun, I shoot into a long narrow box of cotton, which is a method of collecting the bullet and collecting in an intact state and unharmed. To do this I have to shoot into an opening about so big into the box. And by aiming the weapon I usually hold the gun steady with two hands and simply pull the trigger. But in this particular instance in order to pull the trigger, I had to work both fingers into the trigger slot and aim to the point where the weapon was quivering. It took both fingers to pull the trigger. It took both thumbs simply to get the weapon to cock. At times in my examination I had to put the weapon down in this fashion to get leverage between by knees and apply pressure with both thumbs to get the weapon cocked. With the weapon in a cocked position like this it would fire quite easily. But the problem was getting the hammer back or getting the trigger pulled."

Mr. Roper also stated that he had examined the body of Elizabeth Kaye Stuckey and concluded that death was caused by a bullet wound to the head which entered the mid lower left eyelid and exited in the posterior crown of the head.

Mr. Roper stated there was no blood in the mechanism of the pistol.

Mr. Nelson H. Watts testified that he was employed by the Alabama Department of Public Safety as a firearms instructor to the State Troopers. As to his qualifications he stated he was a graduate of the Smith and Wesson Academy, Smith and Wesson Armament School, National Firearms Instruction School, FBI Firearms School, Remington Firearms School and the Browning Company. He stated that he had examined six or seven hundred .38 Smith and Wesson pistols a year.

Mr. Watts described State's Exhibit No. 10 which was the .38 caliber Smith and Wesson pistol recovered from appellant's car which was verified as the murder weapon. He explained that this weapon had two safety devices which would pre-

vent it from firing unless the trigger was pulled and held to the rear. He stated that the gun would not go off if it was dropped, the trigger had to be pulled back and held to the rear so the hammer would fall. The other safety feature prevented the firing pin from protruding unless the trigger was pulled and held back. This witness explained that if the weapon was dropped or a pencil was slammed against the hammer it would not fire because of the two safety devices. It could only be fired by cocking it and holding the trigger back until the hammer falls. Mr. Watts further testified that twelve to fifteen pounds of pressure is needed to fire the weapon when it is uncocked and that in his expert opinion, State's Exhibit No. 10 would not fire accidentally.

Norman Wayne Ward, a Deputy Sheriff with the Montgomery County Sheriff's Department, testified that the only call he received regarding the Stuckey murder case came from the City Police Desk. The caller related that there had been a shooting and the victim was at St. Margaret's Hospital.

Captain Robert F. Holton of the Montgomery Police Department testified that all calls received by the Department were marked and stamped, by time on an IBM card. He stated he had a card showing a call from St. Margaret's Hospital at 12:42 a. m. on March 4, 1974. This IBM card reflected that the substance of the call was that there was a victim with a gunshot wound in her head and that she was dead on arrival at the hospital. The card further showed that two detectives were dispatched to the hospital. Captain Holton stated that this call was the only one received from St. Margaret's Hospital. When the detectives arrived at the hospital, they learned that the offense was committed in Ramer and they notified the Sheriff's Office.

Martha Jane Reynolds, a sister of the deceased, testified that in 1973 and 1974 she would spend three or four nights a week with her sister and appellant. She stated that the whole time she was there appellant and her sister always fussed at each other. She stated that in August of 1973 when she arrived to spend the night, appellant immediately started fussing at the deceased, asking where she had been. This witness said they continued to fuss and started fighting.

According to this witness appellant told her sister that if she wanted to leave, just go ahead and pack her bags and leave. At this time the deceased went into the bedroom and appellant followed her and they were still fussing. She heard her sister crying and heard her say, "Go ahead and shoot me, Jerry, just go ahead." She further stated that when they left the bedroom, appellant told the deceased to pack her bags and leave, but she could not get Wendy (the three-year-old child).

Photographs of the body of the deceased were taken by Deputy Sheriff John Moorer at St. Margaret's Hospital and White Chapel Funeral Home. The photographs depicted the wounds on the body of the deceased but the trial court allowed only one of the several photographs in evidence.

Appellant testified that he and his wife attended a party on March 2, 1974, at the trailer of James Ransom, which was located two trailers from his trailer. He stated that the night before the party, he and his wife met Buddy Harris at a bar in Montgomery where each had several drinks and danced. He said there were no arguments or disagreements that night between the three of them. He further testified that Buddy Harris spent the night with him and his now deceased wife and left around ten o'clock the following morning and the next time he saw Buddy Harris was that night at the Ransoms' party.

According to appellant he stayed outside and cooked with Wayne Dicks most of the evening; that he danced with his wife one time and that he did not object to his wife dancing with other men. He admitted drinking three beers during the evening.

Appellant stated that Buddy Harris drank a lot of beer that night and told him that he had been drinking all day. He said that both he and his wife were in good humor at the party and that he was not jealous over her dancing with other men.

Appellant said that he and his wife left the party to go to a wreck around 12:00 midnight. He stated that before leaving Buddy Harris inquired as to what was wrong and that both he and his wife told him that nothing was wrong and for him to wait as they would be right back.

Appellant further stated that he went to the trailer to put his pistol away because he did not have a permit for it and was unaware that his wife had a pistol permit. He stated that he went into the bedroom to put his gun in the holster hanging near his gun rack. He said his wife came in behind him and walked over near the night stand and called his name. He stated that he turned around and when he did the gun went off hitting his wife. That after the gun fired, he threw it on the bed and tried to keep his wife from falling by putting her on the bed but was unable to put her on the bed. He then said he put her on the floor and tried to stop the bleeding.

Being unable to stop the bleeding, he called his sister's house, Mrs. Randy Ransom, for help.

Appellant stated that he told Kenny Broadway to come quickly, that he had accidentally shot his wife. He said he called the operator and was told that St. Margaret's was the emergency room hospital. According to appellant, Buddy Harris, Wayne Dicks and Kenny Broadway came in while he was on the telephone. That Buddy Harris asked him, "what the hell had he done," that when Buddy said that, the operator was telling him about the emergency room hospital and that was the reason he did not respond to Buddy Harris' question. Appellant further stated that he told the operator to have a Deputy Sheriff meet them at the hospital because there had been a bad accident.

Appellant testified that Buddy Harris came into the bedroom first, closely followed by Wayne Dicks and Kenny Broadway. He said that he was on his knees at his wife's feet when they carried her out to the car. He stated that after taking her outside, he went back inside and got the pistol. He said he drove the deceased to the hospital at a high rate of speed.

He stated that the closet in the bedroom had a shelf about six inches high but the gun was not kept on the shelf. It was kept in the holster. That he was trying to put the gun in the holster when his wife called him causing him to turn and accidentally shoot her.

Appellant said the trigger on the murder weapon was easier to squeeze than his rifle and shotgun.

On cross-examination appellant admitted that at times he kept his pistol in the closet in the bedroom, and more particularly on the shelf in the closet. He had no explanation why his brother-in-law knew about his deceased wife's pistol permit and he did not know she had one.

Appellant stated that he was putting the gun in the holster without holding the trigger or cocking the firing mechanism, yet when he turned in response to his wife's call, the pistol fired.

Appellant admitted that he and his deceased wife had marital problems before the shooting, specifically over the bank book and the deceased staying at her mother's home. He also admitted telling the deceased the night her sister was there to pack her bags and go live with her mother.

He demonstrated to the jury how he put the gun in his holster the night of the shooting, particularly showing the jury how his finger was not on the trigger and the weapon being uncocked. Appellant

further stated that he had no explanation as to why the bullet entered and exited his wife's head in a straight line with absolutely no angle. He said he threw the gun on the bed after he shot his wife. He stated the gun was lying flat on the bed. He could not explain how the gun got two inches of blood in the barrel and he could not explain the fact that he was seen with the gun lying next to his left thigh when he sat on the bed. He testified that the gun was on a bloodstain in the middle of the bed and that was the reason for the blood being on the gun, but he could not explain how the gun was placed next to his left hip when he sat on the bed which position was away from the blood in the middle of the bed.

Appellant further testified that he did not remember Buddy Harris helping carry his wife to the car. He could give no reason for going back into the trailer and getting the pistol before taking his wife to the hospital.

A host of witnesses testified to the good general reputation of appellant in the community and also that his reputation for truth and veracity was good. They further testified that appellant and the deceased appeared to be in good humor the night of the party. These witnesses were long-time friends of appellant and some were his co-workers. They all admitted drinking beer or mixed drinks at the party and that a lot of dancing was going on.

The evidence tends to show that the party was very lively and there were at least two instances of men carrying other men's wives to bedrooms which provoked considerable difficulties and a fight in which one man beat his wife.

One of the witnesses who testified as a character witness for appellant said he had a *low boiling point*.

Some of the witnesses at the party testified that Buddy Harris was drunk or pretty tight.

The state called a number of rebuttal witnesses who testified that appellant's reputation in the community for truth and veracity was bad. That his reputation in the community for peacefulness and quietude was loud, ugly and boastful.

A co-employee of the deceased testified that she was "very unhappy, upset, scared and desperate" the last week she worked before her death. That they usually had lunch together but did not that week as the deceased was looking for an apartment.

Raymond Silas stated that he was with appellant and the deceased at a lounge the night before she was shot. He said he danced with the deceased and when he did, appellant became upset and said some ugly things to him.

Deputy Sheriff John Moorer was recalled as a witness for the state and testified that he first saw Buddy Harris around 1:45 a. m. on March 3, 1974, and that he was sober. He further stated that he saw Buddy Harris again at 2:45 a. m. and was with him until 6:30 a. m. and that Harris was entirely sober.

Appellant was indicted for murder in the first degree and he was convicted of murder in the second degree. The Court charged the jury on all four degrees of homicide.

■ In a prosecution for murder it is for the jury to determine the claim of the accused that the shooting was accidental. *Harrell v. State*, 160 Ala. 91, 49 So. 805; *Powell v. State*, 219 Ala. 557, 123 So. 34; *Macon v. State*, 36 Ala.App. 651, 63 So.2d 32; *McMillan v. State*, 44 Ala.App. 216, 205 So.2d 603; *Smith v. State*, 54 Ala.App. 96, 304 So.2d 914.

■ Conflicting testimony is for the jury, and a verdict rendered thereon will not be disturbed on appeal. *Eady v. State*, 48 Ala.App. 726, 267 So.2d 516; *Pugh v. State*, 51 Ala.App. 164, 283 So.2d 616.

■ Appellant's motion for a new trial was overruled and denied. In reviewing the refusal of a motion for a new trial, this Court will indulge every presumption in favor of the correctness of the ruling of the trial court and the decision thereon rests largely within the discretion of the trial judge. *Espey v. State*, 270 Ala. 669, 120 So.2d 904; *Owens v. State*, 40 Ala. App. 36, 109 So.2d 141; *Moore v. State*, 52 Ala.App. 179, 290 So.2d 246; *Jones v. State*, 54 Ala.App. 251, 307 So.2d 59.

■ We have carefully considered the refused charges in the light of the oral charge and the charges given at the request of appellant and have concluded that the refused charges, stating correct principles of law, were fully, adequately and substantially covered in the oral charge and the given charges; hence, their refusals were proper. *Cannon v. State*, 53 Ala.App. 509, 301 So.2d 272; *White v. State*, 249 Ala. 158, 30 So.2d 468; *Chambers v. State*, 264 Ala. 8, 84 So.2d 342; *Kennedy v. State*, 291 Ala. 62, 277 So.2d 878.

We find no reversible error in the record, and the judgment of conviction is affirmed.

Affirmed.

All the Judges concur.