Assault with intent to murder; fifteen years.
The indictment, omitting the formal parts, charges:
 "Thomas Edward Savage unlawfully and with malice aforethought, did assault Tommy Houston, with the intent to murder him, against the peace and dignity of the State of Alabama."
In support of this indictment the State presented the following evidence:
Steve Aldridge, an investigator with the Colbert County Sheriff's Department, testified that he investigated the shooting of Tommy Houston at the "Rock Club" in Colbert County. Aldridge stated that he arrived at the club about 10:15 P.M., but the victim, Houston, had already been taken to the hospital. The appellant, Thomas Edward Savage, was not at the scene, but he was seen by Aldridge at approximately 2:40 A.M., at the jail. Aldridge said that the appellant appeared to be "upset, shaken and appeared to have been drinking to me." Aldridge stated that no statement was taken from Savage at that time, but one was taken the following morning, September 17, 1977.
According to Aldridge, the statement by the appellant was voluntary and was given after he had been warned of his Miranda
rights. Further, Aldridge said that the statement was read to the appellant and that he signed each of the three pages of the statement.
The contents of the statement revealed that appellant was with Arthur Malone, Queenie Malone and Sara Patrick on the night in question and that the Malones were arguing with the victim. According to the appellant's statement, when the Malones left, the victim started an argument with the appellant and said to appellant, "Why don't you carry your gray ass home." The appellant responded that he "didn't have to go home." At that point, Houston got a piece of iron pipe, about two feet long, from a nearby car and started toward appellant with the pipe raised in the air. The appellant warned Houston to stop, but he kept approaching. The appellant then reached into his pocket with his left hand, pulled out a pistol and shot Houston.
The appellant admitted in his statement that he had drunk about "one shot" of vodka before the incident and that he had drunk about three-quarters of a pint of vodka afterwards while he was waiting for the police to arrive.
Aldridge indicated that, after he saw the appellant at the Colbert County Jail, he was taken to the hospital where a blood test was made. The test revealed the presence of .20 percent ethyl alcohol in the appellant's blood.
During cross-examination Aldridge admitted that a statement had been taken from Sara Patrick on September 20, 1977, at the appellant's trailer. Following an identification of the statement by Aldridge, the defense attorney offered the statement into evidence, but it was not admitted after an objection by the State was sustained. Statements taken from Darien Armstead and Larry Armstead were also offered by the defense and were refused when objections by the State were sustained.
Robert James Mason was the operator of the "Rock Club" on September 16, 1977. Mason recalled that his attention was drawn to Tommy Houston when he "heard them outside cussing." Mason testified that he went outside to see what was happening when he heard Queenie Malone, also known as Baby Lou, and Houston outside the club arguing. After Mason tried to convince Houston to leave, Sara Patrick yelled at him from several feet away. According to Mason, Houston was walking away when she yelled, "You want something at me," and Houston replied, "You kiss my ass." The witness testified that, at that point, the appellant, who was with Sara Patrick, started toward Houston and said, "Say it again Nigger, say it again." Mason recalled that the appellant pulled a gun "when he got about half way." Mason stated that the appellant continued to say, "Say it again Nigger," then said, "G__ d___ it, say it again," and then fired the shot. *Page 377 
According to Mason, Houston took a piece of stick from a nearby truck after he was threatened by the appellant. Mason stated that Houston held the stick "down beside him." Mason acknowledged that Houston did not make any motion with the stick. Further, Mason said that he got between the appellant and Houston when the appellant came closer and that the three of them started moving in a circle. According to Mason, the appellant shot Houston as they were moving around. Mason testified that the appellant used his right hand to fire the gun and that the victim "never said a word."
According to Mason, the appellant was walking "pretty fast" to where the victim was standing. Mason stated, "Bubba Savage was after Tommy." After the shot was fired, the victim fell to the ground.
During cross examination, Mason denied ever having a gun battle with Houston and stated, "I haven't shot at anyone, — If he did I didn't know it." Also, Mason admitted that he had been convicted of murder in the second degree.
Further, Mason denied that the victim, Houston, ever reached to get the stick "when Thomas first pulled the gun out."
Larry Armstead testified that he was at the "Rock Club" on the night of the shooting. He was standing outside with his brother, Robert Darien Armstead, when an argument in the parking lot between Houston and Queenie Malone was overheard. According to Armstead, Sara Patrick said to Houston, "something about I have a .38 colt" and Houston replied "Smith and Wesson make a whole lot of them." At that point, Sara Patrick made another comment and "Tommy cursed her." Armstead said that he did not know exactly what was said, but, after the exchange of words, the appellant walked quickly to where Houston was standing. At that point, the appellant repeated about three times "say it again nigger, say it again." Armstead stated that, when the appellant got about half-way to where Houston was standing, the appellant pulled a gun with his right hand. Armstead testified that the appellant and Houston were moving around in a circle and Jim Mason tried to part them. Armstead recalled that the appellant pushed Houston before shooting him. Armstead never saw Houston with any kind of stick or instrument.
Darien Armstead, Larry Armstead's brother, testified that, on the night of the shooting he also was at the "Rock Club," he and the Malones had had an argument approximately an hour after his arrival at the club. Houston was talking to them outside the club near the corner of the building. Armstead remembered that, when Houston completed his conversation with Malone, Sara Patrick made a remark, "I got a .38 and Tommy do you want some of it?" Armstead said Houston replied, "Smith and Wesson make a whole lot of them." According to Armstead, at that point, Patrick made another remark, and Tommy Houston replied, "Kiss my ass." The appellant approached Tommy Houston and said, "say it again nigger."
Armstead testified that he did not see a weapon in the hands of the appellant as he approached the victim. However, he did see the victim grab a stick while he and the appellant were moving in a circle. Further, he said the appellant continued saying, "Say it again" but the victim made no reply. According to Armstead, the appellant walked quickly to where the victim was, and "Bubba pushed him." At that point, the victim "got a stick off the back of the truck."
Armstead recalled that Houston never made any motion with the stick, but "it was down." Armstead did not remember seeing the appellant reach into his pocket for the gun. He remembered seeing only the gun when Tommy Houston was shot.
Approximately thirty-five minutes after the shooting, the appellant was seen by Armstead at his house talking to Armstead's father.
During cross-examination, the defense introduced a statement which had been made and signed by Darien Armstead and given to Officer Aldridge. The defense pointed *Page 378 
out that Darien Armstead had previously stated to the police that Tommy Houston moved to the back of the truck and got a stick before advancing towards the appellant, twirling the stick. Armstead explained that he had made this statement but he meant only that Houston was moving the stick from side to side as he held it. Also, Armstead explained "[t]hat I'm saying he walked upon him like this — you can walk towards somebody, you don't have to walk directly to them, you can walk up to somebody sideways."
Tommy Houston, the victim of the shooting, testified that as a result of the incident he was "paralyzed from the neck down." Further, he stated that he had never had any serious trouble with the appellant before the argument at the "Rock Club" and that he had known the appellant "almost all of his life."
Houston testified that Sara Patrick asked him "did I want some of this .38 or something," and he replied, "I told her Smith and Wesson made a bunch of them." According to Houston, she continued to taunt him and "I told her to kiss my ass and I turned around and walked off." According to Houston, he had no weapon at that time, and, within thirty or forty-five seconds after the verbal confrontation with Sara Patrick, the appellant fired the shot. Houston stated that, before the shot was fired, the appellant walked over to Houston and said "say it again nigger, say it again." Houston stated that he was first pushed by the appellant before he was shot. Houston said he never saw the gun when it was fired and that all he remembered was "I fell to the ground."
Houston did not remember moving in a circle, but recalled "I know he walked up to me and pushed me and I kind of turned. I guess that's maybe where they got the circle motion. When he pushed me I turned and I guess that's where I grabbed the stick." He testified that the bullet hit him in the left side of the neck and that "it is still in there."
During cross-examination, Houston recalled that he had testified at the preliminary hearing. He was then asked if he had given testimony that he had never been convicted of any criminal offense. After an objection by the State, the jury was excused from the courtroom, and the defense attorney presented evidence that Tommy Houston had been convicted of assault with a dangerous weapon in violation of § 13-1-45, Code of Alabama 1975.
Defense counsel argued that the testimony was relevant because it was being offered for impeachment purposes, first to contradict the statement made at the preliminary hearing by Houston that he had never been convicted of any criminal offense and second, for the purpose of showing the propensity of the victim for violence and blood-thirstiness in regard to dangerous weapons. Also, a self-defense plea had been made in this case. The State argued that such impeachment was on an immaterial point and that the offense did not involve moral turpitude. Further, the State assigned as grounds for objection that self-defense had not been established. The court sustained the State's objection, and the jury was not allowed to hear this testimony.
Tommy Houston did testify on cross-examination that he drank one beer approximately three or four hours before the shooting occurred. He did not remember picking up a stick. He testified that at the preliminary hearing he had stated that he had just "gotten out of the hospital and everything was still fuzzy." He testified that the testimony he was giving during the trial was true.
Bobby Ables, Chief Deputy of the Colbert County Sheriff's Department, testified that he arrived at the "Rock Club" at approximatley 10:06 P.M. on September 16, 1977. When he arrived, he found a young man lying on the ground in front of the building. Ables later learned that the man was Houston. He stated that he asked the man, "Who did this to you?" Ables said that, because he did not get a response, he held his ear next to the young man's mouth, then repeated the question. Ables testified that, "he made a sound as he was trying to *Page 379 
tell me someone's name like `Bubba'." Ables stated that he knew the young man had been shot, but did not know the location of the wound.
After gaining certain information at the club, Ables then went to the appellant's trailer. Ables said that Sara Patrick was the only person at the trailer at that time and that he left after taking a statement from her.
According to Ables, after receiving a radio dispatch, he again went to the appellant's trailer and arrested Savage at approximately 1:30 A.M. He testified that the appellant was intoxicated at the time of the arrest and that Sara Patrick and Arthur Malone were also at the trailer.
At the end of Ables' testimony, the State rested its case, and the appellant made several motions, one of which was for a "directed verdict." The court overruled all the motions and the defense called the appellant to the stand.
Savage testified that in 1969 he had suffered a stroke which affected his right side and head. He stated that he was now totally and permanently disabled and that he was partially paralyzed on his right side. According to the appellant, his right hand and arm were paralyzed and he could not pull the trigger on the pistol with his right hand.
The appellant stated that, on the night of the shooting, he was at the "Rock Club" and before going to the club he had been drinking vodka and beer. The appellant testified that he had walked out of the club with "Baby Lou" Malone, Arthur Malone and Sara Patrick. He said that the Malones began arguing with Tommy Houston, and that Houston came over to him and asked, "Why don't you carry your gray ass home?" The appellant testified that he responded, "You can't make me go home, no sir, I'm old enough to, you know to stay out." At that point, the appellant said that Houston told him, "I will make you go home, and he reached in the car or truck or something and got a stick." According to the appellant, he told Houston, "Don't do it — don't do it, Tommy, don't do it." The appellant recalled that Houston continued to approach and that he tried to stop him. The appellant testified that when Houston raised the stick he shot him.
According to the appellant, Houston was approaching him from about twenty feet away. The appellant said that he did not intend to kill Houston and stated that he intended to shoot Houston in the shoulder; however, he was shot in the neck. Further, the appellant stated that he did not remember Jim Mason stepping between the arguing men. Savage contended that, until he shot Houston, he had not moved from his position.
The appellant recalled that he either lost the gun in a pasture or threw it away. Further, he said that he knew the victim's reputation in the community for violence and blood-thirstiness and that it was bad.
At the end of Houston's testimony, the defense rested its case and the State called as rebuttal witnesses, Robert James Mason and Tommy Houston.
Mason testified to the appellant's physical ability to fire a rifle right-handed, even though the appellant had suffered a stroke. Houston testified that he had seen the appellant use a sledge hammer, picks, and shovels when he had worked with him in the summer of 1977.
 I
The only issue raised by the appellant is whether the trial court committed reversible error when it refused to allow defense counsel to impeach a prosecuting witness by showing his prior inconsistent statement made at the preliminary hearing. The appellant maintains that, although the introduction of the conviction was not admissible for the purpose of showing propensity for violence or a crime involving moral turpitude, the fact that the preliminary hearing statement was contradictory was a sufficient reason for its admissibility.
Tommy Houston, the victim, had previously been convicted of assault with a dangerous weapon. Assault with a dangerous *Page 380 
weapon is not a crime involving moral turpitude. See McElroy's Alabama Evidence, § 145.01 (9).
The Alabama Supreme Court has defined moral turpitude inMeriwether v. Crown Investment Corp., 289 Ala. 504,268 So.2d 780. Convictions of crimes involving moral turpitude may be used to impeach a witness. See § 12-21-162, Code of Alabama 1975.
In Blakey's Heirs v. Blakey's Executrix, 33 Ala. 611, the Alabama Supreme Court addressed the issue of whether the testimony of a witness on an immaterial matter could be contradicted for impeachment purposes. The court reiterated the well-settled rule that it is impermissible to impeach a witness on an immaterial matter when it stated:
 "It is a well-settled rule, that a witness cannot be cross-examined, as to any fact which is collateral and irrelevant to the issue, merely for the purpose of contradicting him. And if a question, which is collateral or irrelevant to the issue is put to a witness, his answer cannot be contradicted by the party who has asked the question but it is conclusive against him." See Kilpatrick v. State, 51 Ala. App. 352, 285 So.2d 516.
In the instant case, Houston's testimony as to whether he had been convicted of a crime had no bearing on the circumstances which resulted in the appellant shooting Houston. The fact that the victim had committed a crime separate and apart from the offense with which the appellant was charged had no bearing on that offense. No showing of any connection between the crime for which the appellant was on trial and the crime with which the victim was previously convicted was made.
As the appellant recognizes under the circumstances of this case, testimony of Houston's conviction as not admissible to show the victim's propensity for violence, nor was it admissible as a crime involving moral turpitude. The inconsistent statement of the victim concerning a conviction of an unrelated prior crime is not material to the issue of whether the appellant is guilty of assault with intent to murder. The trial court's refusal to allow the introduction of Houston's conviction under these facts was proper.
The testimony of Robert Mason, Larry Armstead, and Darien Armstead showed that the appellant was the aggressor. Although we recognize that their theory of the occurrence was in conflict with that of the appellant, it was for the jury to determine the facts from the conflicting testimonies. Waters v.State, 55 Ala. App. 646, 318 So.2d 242; Stuckey v. State,57 Ala. App. 85, 326 So.2d 150. If Houston's testimony had been impeached or had been totally disregarded, there was still sufficient evidence for the jury to find the appellant guilty.
Based on the foregoing, it is our judgment that the result in this case would not have been different had the prior conviction of the victim, Tommy Houston, been admitted into evidence. Rule 45, A.R.A.P. Further, it was incumbent upon the appellant not only to show that the trial court committed error, but also to demonstrate that such error was probably injurious. Kennedy v. State, 291 Ala. 62, 277 So.2d 878. Whether there was injurious error by the trial court must be determined from an analysis of the entire record. Kennedy, supra.
 II
The elements of the offense of assault with intent to murder are set out in Lawhon v. State, 41 Ala. App. 577, 141 So.2d 205. A conviction for this offense is authorized if the evidence shows an assault with intent to take life under circumstances which would have constituted murder if death had resulted. Hammv. State, 56 Ala. App. 632, 324 So.2d 345. The intent to take life is an essential element of the offense. Morgan v. State,33 Ala. 413.
In the present case, the State's evidence revealed that the appellant precipitated the difficulty and was the real aggressor. Testimony from three eye-witnesses indicated that the victim did not have a weapon at the beginning of the *Page 381 
difficulty. Although he later took a stick from a nearby car, he did not exhibit it in a menacing manner. The testimony indicated that the victim held the stick down beside his body. Further, it was also shown that no blows were made by the victim and that the shooting occurred within seconds after the appellant had directed some remarks to the victim. Also, the testimony revealed there was no history of any prior difficulty between the victim and the appellant. From aught that it appears, appellant's shooting of Houston was an unprovoked attack.
Under these circumstances, and after a careful consideration of the evidence, the proof was sufficient to warrant the jury in finding that the assault was made under such circumstances which if death had ensued, would have been murder.
Regarding the question of whether the elements of self-defense existed, we are of the opinion, based on the testimony of Mason and the Armstead brothers, that the jury was warranted in finding that the appellant had reasonable room and mode for escape.
The evidence in this case presented factual issues for the jury's determination, and the evidence was sufficient to sustain the verdict; therefore, the trial court committed no error in refusing the "directed verdict." Baldwin v. State,342 So.2d 940; Johnson v. State, 51 Ala. App. 172, 283 So.2d 624;Gilmore v. State, Ala.Cr.App., 339 So.2d 116.
We have read and examined this record and have found no error prejudicial to appellant; therefore, the judgment of conviction by the Colbert Circuit Court is affirmed.
AFFIRMED.
All the Judges concur.